MICHAEL DERRICK, Plaintiff-Appellee, *v.* THE YODER COMPANY, Defendant-Appellant.

First District (2nd Division)    No. 79-910

Opinion filed September 16, 1980.

French & Rogers, of Chicago (Richard G. French and Michael C. Kominiarek, of counsel), for appellant.

Cooney & Stenn, of Chicago (Robert J. Cooney and James T. Newman, of counsel), for appellee.

Mr. JUSTICE HARTMAN delivered the opinion of the court:

As damages for the loss of his right arm almost to the shoulder, a jury awarded plaintiff, Michael Lance Derrick (Derrick) $444,000, having found defendant Yoder Company (Yoder) guilty of defectively designing and manufacturing a metal slitting system in a products liability action. Yoder appeals, presenting as issues for review whether: (1) Derrick assumed the risk of injury; (2) the design of the machine was reasonably safe when used for the purpose intended; (3) the product performed as might reasonably have been expected in light of its nature and intended function and therefore was not unreasonably dangerous; and (4) Yoder was under a duty to design and manufacture a product incapable of causing injury when an alternative design was neither feasible, effective, practicable nor technologically possible at the relevant time. For the reasons which follow, we affirm.

Derrick was employed by Leavitt Tube Company (Leavitt) as a slitter helper in a tube production facility in which three slitting lines were operated, each of which employed a slitting machine designed and manufactured by Yoder. The machine involved in this case was designated "No. 3" and was similar in make-up to the other two. The slitting machine transformed flat steel material, as wide as 48 inches, coiled in the form of a roll having a diameter as great as 72 inches, into smaller strips or strands and recoiled onto another drum in one continuous operation. These strands would later be shaped into tubing. Each slitting line possessed three major components. At the starting end of the line was located a drum on which a roll of uncut flat steel was secured. From this point it was uncoiled from the roll on a horizontal plane at about four feet above floor level and drawn through the second component consisting of slitting knives positioned

above and below the material, similar to scissors, as it passed through. The slitting knives cut through the flat steel creating the strips or strands of a desired width and occasionally resulted in the development of metal burrs or slivers, from one-fourth inch to four inches long, hanging onto the cut edges of the individual strands. The resulting strands were drawn further along the horizontal plane to the terminal end of the system consisting of a single, common drum on which the strands were recoiled once again, this time into individual strand rolls.

The motor-driven recoiler supplied the drawing power and movement through the slitting process and onto the recoiler. Tension created by the winding recoiler also assisted in the formation of straight-sided individual strand coils. If proper tension was not maintained, the individual coils would fall apart and could not be removed in usable form from the recoiler drum. Upon successful completion of the process, the individual coils, now fully wound on the common recoiler drum, were removed for further processing into tubes. Frequently, before reaching the recoiler, individual strands would sag below the horizontal line, which was symptomatic of a deficiency in strand tension. To re-establish tension in those coils, paper strips of varying lengths would be inserted in the developing individual sagging strand at the pinch point created where the strands met the developing coil being wound onto the recoiler drum. The strands ran over and onto the drum from above so that the inward pinch point was beneath the horizontal strands about to be wound. The slitting and winding process was conducted at a considerably high speed, varying as the diameters of the coils built up on the recoiler drum, and ranging from 150 feet of material per minute when the drum was bare to 450 feet per minute at the maximum size of the coil. All three slitting lines were operated 24 hours per day and six days per week at Leavitt. A slitter helper, such as Derrick, maintained surveillance of the steel strands to assure tight recoil rolls.

The cost of slitter No. 3 was $164,044.40. Yoder, through its engineers and sales personnel who visited Leavitt and witnessed its operation, knew of the dangers attendant to the hand stuffing of paper at the recoiler. It warned purchasers of its machines against that practice and sent explanatory written material to them for their own knowledge and for dissemination to their employees. No safety devices or guards of any kind were designed or placed by Yoder at the danger area of the inward pinch point to prevent the hand stuffing of paper because, Yoder's manager of engineering asserted, Yoder did not know how to design an effective guard for that area. No warning signs were affixed by Yoder to the machines in the danger area to remind a slitter helper of the impending danger or likelihood of injury. Although decal stickers were sent by Yoder to Leavitt to be affixed to the machine, whatever warning was given on the decals or where they were to be placed cannot be ascertained in the record.

Three tensioning devices manufactured by Yoder, designed to take up slack and maintain the necessary coil tautness, ranged in additional cost from $4,200 to $70,000. The least costly was a semiautomatic paper stuffer, and the most expensive was a roll tension stand which employed an adjustable pinch roll arrangement including rolls, gears and drag generator or brake automatically producing the necessary tension. No device was affixed as a standard component to the machine sold to Leavitt but one was available only as optional equipment. A paper stuffer had been purchased by Leavitt for machine No. 1 some years previous, following an accident in which another employee's arm was severed during the operation. No such devices were purchased by Leavitt from Yoder for machine Nos. 2 and 3 until after Derrick's mishap, at which time paper stuffers were also secured for them.

The Yoder paper stuffer is positioned on rails or tracks running on the floor underneath the machine between the slitting and the recoiling operations, at an intersecting angle to the strands of metal above. Strips of paper emerge sideways from a flat nozzle type device aimed by the operator at the inward pinch point of the sagging strand. The operator of this device can stand away from the danger point, position the nozzle, and push a button in order to dispense the necessary paper into the appropriate pinch point. This device was available in 1969, the same year in which slitter No. 3 was sold by Yoder to Leavitt. Slitter helpers employed by Leavitt testified that Yoder's paper stuffing machine did not work properly from 20 to 50 percent of the time, frequently jamming or failing to roll correctly on its tracks, requiring the hand stuffing of paper for the balance of the time. Leavitt declined to purchase paper stuffing devices from Yoder when it bought slitters Nos. 2 and 3 primarily because the machine was cumbersome, inconvenient to use, frequently jammed and was not compatible with Leavitt's use of the slitter.

A safety device designed by a different company, Pneu Powr, guarded the point of danger involved in this accident, according to plaintiff's evidence. It came to the attention of Leavitt's chief engineer and plant manager several months after Derrick's accident through reading a magazine article. A defense witness stated that it did not become available until April or May of 1974. The device permitted slitter helpers to place paper strips into a three-eighths-inch slot and blocked their hands from getting into the area of the inward pinch point of the recoiler. The Pneu Powr device, when installed, positioned itself automatically, rising with the steel coils as they built up on the recoiler drum. It did not slow down production, and its cost was from $1,000 to $1,500. A slitter helper would still have to crouch under the moving steel strands as they rolled onto the recoiler even with the safety device. According to the defense, the Pneu Powr device was not recommended by an ad hoc committee of the American National

Standards Institute which promulgated and developed safety standards for machine tool manufacturers because the device required an additional work station and the operator would still have to be under the running strips stuffing paper, which was an invitation for some person to enter a hazardous area and create a pinch point equally dangerous to the one that existed.

Derrick was 28 years old at the time the accident occurred and had been educated through high school. While in high school he was employed as a driller on the body construction line by Ford Motor Company. He worked as a burr operator for Leavitt in 1969, a job which involved rounding off the ends of finished tubing. Thereafter, he worked in the slitting department where he was trained for four to six months by experienced slitter helpers. He was required to feed paper into the slack strands manually when he worked on slitters Nos. 2 and 3. He never saw any written instructions or an operator's manual as to how to perform his work, was never told not to feed paper by hand and was trained to do just that.

On the date of the accident, the steel was running very fast and Derrick had to stuff paper into about every coil in order to assure tight winding. No other method was provided on slitter No. 3 where he was working. The paper was thin, was from one inch and one-half to two inches wide, and was torn into strips 24 to 36 inches long, depending on the need, from a roll at his feet. He folded the strip in half and creased it at the top so that it would become rigid. He stooped over and, looking up, concentrating on the recoiler, placed the paper strip with his right hand. At that point, the steel was over his head coming from behind him. He was wearing cloth gloves and heavy canvas cuffs in order to avoid cuts on his hands and arms which could result from falling scrap steel. At the moment of the accident, Derrick felt a tugging on his glove. He assumed that a burr at the edge of the steel had caught on the glove. It pulled him off balance toward the recoiler, which was going so fast that his arm just disappeared and he was picked off his feet and "thrown around like a toy." His injuries necessitated the amputation.

Derrick was aware of the development of burrs in the process of slitting, depending upon how sharp the slitting knives were. He never knew when to expect a burr. He had bid on the job because there was more money involved in this type of work. He had been working on slitter No. 3 for more than three years at the time of the accident and was very familiar with its operation. He creased the paper to make it firm, "and plus, it would be safe that way, too." Customarily, he "* * * would always stay a safe distance from it. * * * [A safe distance would be] eighteen inches; sometimes a little more." He knew that one shouldn't get too close to the recoiler at that point because "* * * it was obvious it was dangerous." For three years he knew that if he got too close his hand could be taken in just

like the paper. He never asked to see a manual on how to operate the machine and was never shown one. He knew that one of his foremen had lost his arm working on the machine, but he didn't know exactly how that happened. He heard of a clothespin method of stuffing the paper but did not recall ever seeing it used.

## I.

Yoder's first argument is that Derrick assumed the risk of his injuries in consideration of his knowledge, understanding and appreciation of the dangers involved, as well as his age, experience and the obviousness of the danger. Relying upon *Williams v. Brown Manufacturing Co.* (1970), 45 Ill. 2d 418, 261 N.E.2d 305, Yoder maintains that just as Williams recognized and voluntarily accepted the danger of operating the bucking trencher there involved, Derrick was equally experienced in the operation of the recoiler and aware of the dangers of manual paper stuffing. Recognizing that in *Williams* the supreme court regarded assumption of risk as a question ordinarily to be determined by a jury, Yoder contends that here no question of fact arises because plaintiff admitted knowledge of all the elements of the assumption of risk defense, namely: it was dangerous; burrs would occur; his arm could be pulled into the recoiler; and he appreciated and understood that risk, yet deliberately exposed himself to it. Yoder also relies upon *Fore v. Vermeer Manufacturing Co.* (1972), 7 Ill. App. 3d 346, 287 N.E.2d 526; *Denton v. Bachtold Brothers, Inc.* (1972), 8 Ill. App. 3d 1038, 291 N.E.2d 229, *appeal denied* (1973), 53 Ill. 2d 607; *Ralston v. Illinois Power Co.* (1973), 13 Ill. App. 3d 95, 299 N.E.2d 497; *Moran v. Raymond Corp.* (7th Cir. 1973), 484 F.2d 1008, *cert. denied* (1974), 415 U.S. 932, 39 L. Ed. 2d 490, 94 S. Ct. 1445, and *Prince v. Galis Manufacturing Co.* (1978), 58 Ill. App. 3d 1056, 374 N.E.2d 1318, *appeal denied* (1978), 71 Ill. 2d 614.

Derrick counters that although he knew the pinch point in which he was inserting paper was dangerous, he was careful to maintain what he believed was a safe distance from that point in order to avoid getting his hand caught therein and did not know that he could be injured while standing that distance away by having a burr catch his glove, pull him off balance and cause him to fall into the recoiler. Derrick asserts that assumption of risk is not simply comprehension and appreciation of the risk that must be shown; rather, it must be proved by Yoder, which has that burden, that he appreciated the *particular* risk involved and voluntarily and unreasonably proceeded to encounter a known danger, citing *Scott v. Dreis & Krump Manufacturing Co.* (1975), 26 Ill. App. 3d 971, 990, 326 N.E.2d 74; *Ralston v. Illinois Power Co.* (1973), 13 Ill. App. 3d 95, 299 N.E.2d 497; and *Karabatsos v. Spivey Co.* (1977), 49 Ill. App. 3d 317, 364 N.E.2d 319.

■■ In a more recent case, *Clark v. Crane Carrier Co.* (1979), 69 Ill. App. 3d 514, 387 N.E.2d 871, *appeal denied* (1979), 79 Ill. 2d 610, the court, review-

ing assumption of risk defenses, also observed that a defendant must prove the user deliberately decided to encounter a known risk, or was willing to take a chance, citing *Doran v. Pullman Standard Car Manufacturing Co.* (1977), 45 Ill. App. 3d 981, 989, 360 N.E.2d 440. In reversing the trial court's sustention of a motion for a directed verdict for defendant in *Clark*, the court held that although Clark obviously knew that there were no steps leading from the ground to the crane cab from which he operated and acknowledged that their absence made the crane carrier unsafe, the injury was caused by something more than just the lack of safety steps; the jury could have found that Clark fell because the front wheels were free moving when slightly off the ground and when he stepped on them in descending from the cab to the ground they would spin, causing him to fall and sustain his injury. The court observed (69 Ill. App. 3d 514, 518):

> "The absence of safety steps made these aspects of the carrier's design relevant to the plaintiff's injury. The evidence did not so overwhelmingly show that the plaintiff was aware of and appreciated *all the circumstances which may have combined to cause his injury*, and still deliberately decided to chance what might happen when he stepped on the front wheel, that a contrary conclusion could not have been reached by the jury." (Emphasis added.)

In the instant case, Derrick clearly knew of some aspects of danger involved in stuffing paper by hand into the unguarded pinch point. He knew that burrs occasionally developed when the knives on the slitter were insufficiently sharp. He was unaware that a passing burr could catch his glove and pull him off balance and into the machine. There was no evidence that this had ever happened to anyone else. He thought he could safely perform his duty by inserting paper into the recoiler from what he believed was a safe distance of 10 inches to two feet away from the recoiler. Based on this evidence we cannot say that the jury's finding, that Derrick did not consciously expose himself to the dangers resulting from that combination of synergic factors or was not willing to take a chance of injury, was against the manifest weight of the evidence.

The facts in *Karabatsos v. Spivey Co.* more nearly approximate the circumstances obtaining in the instant case than the operative facts involved in Yoder's cited authorities. Karabatsos worked as an attendant on a conveyor belt and was charged with lifting boxes as they were diverted from a conveyor belt and placing them on another conveyor belt above. A package "popped" over the diverter and rolled onto the belt toward rollers eight or 10 feet away. Karabatsos reached for the package when it was two feet from these rollers, slipped on some water on the catwalk on which he was moving, and fell onto the belt. His arm was pulled into the rollers and ripped off; he managed to save himself by clinging to a post. Many packages had previously jumped over the diverter and it had become the

practice of the attendants to try to reach them before they were caught in the rollers. Other employees had been hurt doing the same thing Karabatsos had done and knew that it was very dangerous. Karabatsos knew it was dangerous and had seen his supervisor retrieve badly damaged packages caught in the belt and rollers. In considering the question of whether Karabatsos had assumed the risk as a matter of law, thereby obviating the defendant's responsibility, the *Karabatsos* court stated (49 Ill. App. 3d 317, 323):

> "In considering the evidence in the case at bar, the jury could have concluded that *while Karabatsos was aware he would be hurt if his hands were caught in the rollers, he was not aware that he could be injured if he reached for a package several feet away from the rollers*, and we cannot reverse merely because we might have made a contrary finding had we been the trier of fact." (Emphasis added.)

The similarities between Karabatsos' and Derrick's situations are apparent and require a like result in the case at bar.

Yoder's authorities are significantly distinguishable. In *Fore v. Vermeer Manufacturing Co.*, Fore had experienced numerous difficulties with the brakes on the trencher he had been operating, knew of their inadequacies and knew of the particular risk and danger of operating the vehicle on a hill or incline but nevertheless continued operating what he described as a "dangerous and unsafe" machine because he thought it was necessary to keep his job. In contrast, Derrick testified that he believed he could perform his job at a "safe" distance, that he could fold the paper so that it could "safely" be inserted into the recoiler and did not know that a burr could catch on his glove and pull his hand into the point of danger. In *Denton v. Bachtold Brothers, Inc.*, Denton understood the operation of the mowing machine involved, saw the exposed blades and knew it was dangerous to approach them as they revolved but paid no attention either to them or to the means of obviating the danger by using the clutch provided to disengage the blades before he slipped and fell under them. Derrick, however, continually observed the recoiler in operation and maintained himself at what he thought was a safe distance from it. In *Ralston v. Illinois Power Co.*, the plaintiff was standing on a boring rod which had previously buckled three times as a result of hitting hard materials. His pants leg and foot became entangled in the rotating rod which injured him. Ralston knew that standing on the rod was dangerous and had admonished his foreman several times about the hazard, yet deliberately exposed himself to the risk of injury. Unlike Ralston, Derrick sought to take the precautions of safe distance and method to prevent an injury. In *Moran v. Raymond Corp.*, Moran, operating a side-loading forklift truck, left his operator's cage and sought to adjust the height of the forks by operating the control levers from outside the cage and was injured by a descending cross-bar. Moran's

knowledge that he would be injured if he did not get out of the way quickly enough was held sufficient to establish his assumption of risk, particularly when he admitted that he had been instructed always to stand inside the cage when operating the controls, facts totally inapposite to Derrick's situation in the case at bar. In *Prince v. Galis Manufacturing Co.*, the plaintiff was operating a machine which implanted metal roof bolts in the ceiling of an underground mine in order to prevent ceiling collapse. A bolt was being tightened by means of a metal wrench which flew out of the drill chuck in which it was held and struck him in the face. Another machine with a wrench retainer that would have prevented this accident was not used although apparently available to Prince, who was held to have assumed the risk of injury. No such safety equipment was available to Derrick in the instant case.

■■ From the foregoing it is clear that the trial court did not err in denying defendant's motion for directed verdict under *Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 510, 228 N.E.2d 504. A motion for a directed verdict under *Pedrick* should be allowed only where the evidence viewed in its aspect most favorable to the opposite party so overwhelmingly favors the moving party that no contrary verdict could ever stand. The jury in the present case could have found under the evidence, as it did, that Derrick did not fully appreciate the dangers of injury to himself under the particular circumstances which "combined to cause his injury." *Clark v. Crane Carrier Co.*; *Karabatsos v. Spivey Co.*

## II.

Yoder next argues that under the doctrine of strict tort liability plaintiff had the burden of proving that a defect existed in the product at the time it left Yoder's control which made it unreasonably dangerous and resulted in an injury to himself while using the product in the manner and for the purpose for which it was intended. Relying upon *Rios v. Niagara Machine & Tool Works* (1974), 59 Ill. 2d 79, 319 N.E.2d 232, Yoder further claims that it is not sufficient to prove that its product was dangerous, but that it was unreasonably dangerous and although the design of the recoiler may have made the product dangerous, it was the practice of stuffing paper by hand which made it unreasonably dangerous. Yoder cites *Hunt v. Blasius* (1978), 74 Ill. 2d 203, 384 N.E.2d 368, *Genaust v. Illinois Power Co.* (1976), 62 Ill. 2d 456, 467, 343 N.E.2d 465, and *Weiss v. Rockwell Manufacturing Co.* (1973), 9 Ill. App. 3d 906, 293 N.E.2d 375, for the proposition that a manufacturer is not under a duty in strict liability to design a product which is totally incapable of injuring those who foreseeably come in contact with it since virtually any product is capable of producing injury when put to certain uses. Yoder observes that Derrick knew the recoiler was a dangerous piece of equipment if not used properly; it claims there was nothing

unreasonably dangerous about it except in the manner in which he stuffed paper into the pinch point.

The conduct of the operator of machinery is a defense to a product liability action only where it is shown that such conduct amounted to a misuse of the product (*Williams v. Brown Manufacturing Co.* (1970), 45 Ill. 2d 418, 425). The causal connection between an allegedly defective product and the injury is broken only where the misuse was not reasonably foreseeable (*Lewis v. Stran Steel Corp.* (1974), 57 Ill. 2d 94, 102, 311 N.E.2d 128). Reasonable foreseeability in this context is measured by an objective standard (*Anderson v. Hyster Co.* (1979), 74 Ill. 2d 364, 369, 385 N.E.2d 690). The record demonstrates in the present case that Yoder's employees visited Leavitt's plant as often as twice per month at least as far back as the time its slitter No. 3 was purchased by Leavitt in 1969. It was well aware of the need to stuff paper into coils in order to maintain necessary tautness. It knew of the manual paper stuffing practices involved in the use of its slitters. It was apprised of the fact that although these practices were condemned in its letters and manuals disseminated to its purchasers, nevertheless manual paper stuffing was commonly utilized not only at Leavitt but in the entire industry. If hand stuffing of paper into the recoiler to take up slack can be considered a misuse of the slitter, under the foregoing evidence it hardly rises to the level of being a misuse not reasonably foreseeable. *Williams v. Brown Manufacturing Co.*, *Lewis v. Stran Steel Corp.*, and *Anderson v. Hyster Co.*

Because the danger was obvious, it therefore could not be deemed unreasonable, Yoder contends, citing *Weiss v. Rockwell Manufacturing Co.*, *Genaust v. Illinois Power Co.*, *Hunt v. Blasius*, and *Denton v. Bachtold Brothers, Inc.* The testimony reveals that the dangerousness of the pinch point on the recoiler was, unquestionably, clear to all including Derrick; however, that was not the particular danger which caused the accident. Rather, the jury had the right to believe, according to Derrick's testimony, that the unexpected catching of his glove by a passing metal burr which pulled him into the pinch point was a danger of which he was not aware and for which no evidence was shown as to its obviousness. Had Derrick's hand been placed in close proximity to that pinch point itself with its obvious danger, the result in this case might be otherwise. *Weiss* involved dangers inherent in manually pushing ¾-inch plywood through a rotating cutting tool and were considered manifest; in *Genaust*, the propensity of electricity in high voltage power lines to arc toward metal objects was deemed obvious. The risk of injury to automobile occupants in striking a road sign post was no greater than the risk inherent in collisions between motorists and any other stationary objects, as held in *Hunt*; and in *Denton*, the necessity of disengaging the cutting blades from the power train of a rotary mower was patent. In each of the foregoing authorities cited by Yoder, the

injuries were derived from inherent properties of the product being utilized which were obvious to all who came in contact with them, in contrast to what the jury here apparently deemed the unforeseen dangerous combination of circumstances contributing to Derrick's accident which caused his injuries. *Clark v. Crane Carrier Co.*; *Karabatsos v. Spivey Co.*

The obvious danger rule for which Yoder contends was also advanced by it in an earlier case, *Dorsey v. Yoder Co.* (E.D. Pa. 1971), 331 F. Supp. 753, *aff'd* (3d Cir. 1973), 474 F.2d 1339. There, as here, Yoder relied upon section 402A of the Restatement (Second) of Torts, Comment (g), which states, in part, that a defective condition exists "* * * where the product is, at the time it leaves the seller's hands in a condition not contemplated by the ultimate user which will be unreasonably dangerous to him." In *Dorsey* a slitter machine operator had placed his hand four inches from the edge of the metal and nine inches from the slitter's cutters so as to prevent the metal from buckling as it approached the cutters. A sliver of metal (burr) caught the soft part of the palm of Dorsey's hand and carried it through the rollers into the cutters resulting in the almost complete severance of his arm, with only a slice of skin remaining. A surgeon was able to reattach the arm but permanent injury resulted. In considering Yoder's argument for application of the latent-patent defect rule,[1] the district court comprehensively reviewed the authorities, finding the rule to run counter to the more modern and enlightened approach, then developing, that manufacturers should be encouraged to make safer, not more dangerous products. (*E.g.*, 1 Frumer & Friedman, Products Liability §7.02 (1980); 2 Harper and James, The Law of Torts §28.4 (1956).) The danger of unguarded rotary blades, although obvious to Dorsey, did not *ipso facto* preclude recovery and was but one of the factors in determining whether or not the danger was unreasonable. Among other factors to be considered were whether a guard would eliminate the machine's usefulness; whether its cost would be prohibitive; and the balancing of these factors against the seriousness of the potential harm. These, the court held, were fact questions to be weighed by a jury in determining whether, under all the circumstances, the machine was "defective."

■■ The opinion in *Dorsey* cited with approval the theses advanced in *Palmer v. Massey-Ferguson, Inc.* (1970), 3 Wash. App. 508, 476 P.2d 713, and *Pike v. F. G. Hough Co.* (1970), 2 Cal. 3d 465, 85 Cal. Rptr. 629, 467 P.2d 229, which recognized that the manufacturer of an obviously defective product ought not to escape liability because the product design was patently bad; rather, it should be discouraged from misdesigning its product instead of encouraged to produce it in an obviously defective form

---

[1] The seminal authority for this rule, *Campo v. Scofield* (1950), 301 N.Y. 468, 95 N.E.2d 802, has been recently abandoned in its own jurisdiction (*Micallef v. Miehle Co.* (1976), 39 N.Y.2d 376, 379, 384 N.Y.S.2d 115, 348 N.E.2d 57).

(331 F. Supp. 753, 757-63). The jury verdict rendered in that case, in Dorsey's favor, was allowed to stand. The foregoing analysis when applied to the facts in this case provides an additional basis for our holding. Here, although the dangerous pinch point of the recoiler may have been obvious to Derrick, and the utilization of Yoder's remote paper stuffer may have somewhat interfered with production, its cost was not prohibitive, and the seriousness of potential harm was manifest. These factors would have entitled the jury to conclude that the slitter was defectively designed resulting in Yoder's liability under the modern approach taken in *Dorsey*; none of them fall beyond the familiar penumbra of considerations which fact-finders may utilize in determining whether or not a product is defectively designed in Illinois. (See, *e.g., Kerns v. Engelke* (1979), 76 Ill. 2d 154, 390 N.E.2d 859.) As we have held in our preceding discussion of inherent dangers on this point, no basis exists for interfering with the jury's verdict in this case.

### III.

■■ Two final reasons are advanced by Yoder to forestall imposition of liability. It claims, first, that it was under no duty to provide a safety device or guard at the danger point of the recoiler. The supreme court in *Rios v. Niagara Machine & Tool Works* has held to the contrary, however, having expounded upon a manufacturer's duty in similar circumstances, stating (59 Ill. 2d 79, 85):

"In *Bexiga* [*v. Havir Manufacturing Corp*. (1972), 60 N.J. 402, 290 A.2d 281] the New Jersey Supreme Court stated that where a [machine] is unreasonably dangerous absent a safety device, the manufacturer is under a nondelegable duty to install such a device. The court stated:

'The public interest in assuring that safety devices are installed demands more from the manufacturer than to permit him to leave such a critical phase of his manufacturing process to the haphazard conduct of the ultimate purchaser. The only way to be certain that such devices will be installed on all machines—which clearly the public interest requires— is to place the duty on the manufacturer where it is feasible for him to do so.' "

That duty has been recognized and applied in a plethora of cases, of which only a few need be cited, such as *Anderson v. Hyster Co*. (1979), 74 Ill. 2d 364, 368, *Scott v. Dreis & Krump Manufacturing Co*. (1975), 26 Ill. App. 3d 971, 984-86, *Stanfield v. Medalist Industries, Inc*. (1975), 34 Ill. App. 3d 635, 639, 340 N.E.2d 276, and *Fuller v. Fend-All Co*. (1979), 70 Ill. App. 3d 634, 388 N.E.2d 964. In the case *sub judice*, no safety device of any kind was provided at the recoiler although Yoder was fully acquainted with the need

and had in fact produced a relatively inexpensive remote paper stuffing device of its own, which automatically performed that task without creating any risk of harm to the operator. The reason given as to why this safety device was not made a component part of the machine, stated in oral argument, was because Yoder believed that the fractional expense (about 2.56 percent) when added to the $164,044 cost of the slitter would have put it at a competitive disadvantage in the marketplace. That any machine will cost less to manufacture without a safety device than one with a device is ineluctable; however, where the cost is relatively small as compared with the total cost of the machine and the likelihood of injury without it is great as in this instance, failure to provide the device becomes critical. The jury could have regarded the availability, but absence, of a safety device as a component part of the machine sold to Leavitt as evidence of Yoder's culpability in having placed in the stream of commerce an unreasonably dangerous, defectively designed product.

■■ Yoder cites *Willeford v. Mayrath Co.* (1972), 7 Ill. App. 3d 357, 287 N.E.2d 502, for the proposition that a manufacturer is under no duty to produce a machine that is accident-proof, which is, of course, an accurate statement of the law, but inapplicable here. The requisite safety device undoubtedly would not "accident-proof" the slitter in every event, but would have eliminated the need for manual paper stuffing. The absence of a safety device of any kind simply was not sanctioned by the jury in these circumstances. We note in passing from the facts in *Willeford* that safety equipment was included in the unassembled farm elevator manufactured by Mayrath and sold to the dealer for the purpose of guarding against injuries when the assembly consisted of more than one conveyor length. Reliance by Yoder upon *Weiss v. Rockwell Manufacturing Co.*, and *Hunt v. Blasius*, also cannot be sustained. In *Weiss* a multifunctional machine was involved, making it impractical to devise a safety guard for each of the possible applications in which it might have been used. Yoder conceded in oral argument that its slitter cannot be deemed multifunctional in the same sense. Reliance upon *Hunt* is equally misplaced since, as previously shown, if manual paper stuffing could be deemed a misuse, it was one that was reasonably foreseeable, having been an industry-wide practice by virtue of practical necessity, with which Yoder was well acquainted despite its warnings. Yoder's further effort to exculpate itself by shifting liability onto Leavitt because Leavitt refused to buy its remote paper stuffer is also without foundation in the law, as demonstrated by the language we have quoted above from *Rios v. Niagara Machine & Tool Works.*

Yoder's second reason, that a safer alternative was neither available nor feasible, is unpersuasive in light of what we have said relative to the preceding issue, since Yoder's own remotely operated paper stuffer could have demonstrated to the jury that a safety device was indeed technologi-

cally possible, feasible and economically available at the time its slitter No. 3 was sold to Leavitt, but was not made a constituent part of the equipment. The parties argue the advantages and disadvantages of having equipped the slitter with a safety guard such as that manufactured by Pneu Powr. Yoder maintains that such a guard was equally dangerous; that it constituted an invitation to the operator to crouch under the running strands; and that it was unavailable in any event until a year after Derrick's accident. Derrick insists that it effectively guarded the hands of the operator from being pulled into the recoiler; that it did not interfere with production; that it was relatively inexpensive; and that its design was so simple as to have been technologically possible and feasible and could have been supplied with the slitter when first sold. No expert technical evidence was offered by Derrick on this latter point, however. Derrick's further contention that "state of the art" defenses have no place in product liability cases is questionable in light of *Kerns v. Engelke* (1979), 76 Ill. 2d 154, 390 N.E.2d 859, which distinguished cases in which the product itself was unreasonably dangerous from those like *Kerns* and the case at bar, where the lack of a safety device may make a product not reasonably safe, a question to be determined by the fact-finder, in which evidence of the state of the art may or may not be introduced. As in *Kerns*, evidence of the existence of a feasible and economic safety device, the Yoder paper stuffer, was presented to the jury in the instant case and made contemplation of the Pneu Powr guard superfluous.

In consideration of the foregoing, we conclude that the issues presented were properly submitted to the jury and the verdict rendered sufficiently supported by the evidence. Accordingly, we affirm.

Affirmed.

PERLIN, P. J., and STAMOS, J., concur.