GEORGE WARD, Plaintiff-Appellant, v. K MART CORPORATION, Defendant-Appellee.

Fourth District   No. 4—88—0844

Opinion filed June 21, 1989.

LUND, J., dissenting.

Phebus, Tummelson, Bryan & Knox, of Urbana (Joseph W. Phebus and Jeffrey W. Tock, of counsel), for appellant.

Law Offices of Robert P. Moore, P.C., of Champaign, for appellee.

PRESIDING JUSTICE McCULLOUGH delivered the opinion of the court:

In this case we must determine whether a department store has a duty to warn its customers of the existence of concrete posts located just outside a customer entrance to the store or to remove such posts, in order to prevent customers from colliding with them when they are carrying large, bulky items of merchandise from the store. We hold that no such duty exists and affirm the judgment *n.o.v.* which the circuit court entered in defendant's favor.

In his complaint, plaintiff George Ward alleged that on October 11, 1985, he was present as a customer on the premises of a store in Champaign operated by defendant K mart Corporation. Plaintiff alleged that at the relevant time, defendant breached its duty of ordinary care for his safety by committing one or more of the following negligent acts or omissions:

"(a) The customer exit at the northeast corner of the K Mart facility does not open automatically for exiting customers.

(b) The customer exit at the northeast corner of the K Mart facility has a pneumatic closing device which causes the door to close automatically and thereby impede the exit of customers with packages.

(c) The customer exit at the northeast corner of the K Mart facility does not have a window.

(d) There is no warning in the vicinity of the customer exit for the customer to step down to the parking surface upon exiting the door.

(e) There are posts located in close proximity to the customer exit in the northeast corner of the K Mart facility that:

1. impede the exit of customers; and,

2. are below eye level and cannot be seen if a customer's downward vision is obstructed by packages.

(f) There are no warnings in the vicinity of the customer exit in the northeast corner of the K Mart facility which indicate the presence of posts outside the exit."

Plaintiff alleged that as a direct and proximate result of one or more of the above acts and omissions, he forcibly collided with a concrete-filled metal pipe as he exited the above-mentioned door while carrying a full-length mirror. Plaintiff alleged that as a result of this collision, he sustained a facial laceration and injuries to his right eye. Plaintiff subsequently amended his complaint to allege K mart negligently placed steel posts in front of a customer exit door and that the door was constructed with a step of such a height that it created a tripping hazard. Plaintiff further alleged that as a result of his collision with the post, he suffered a head trauma which resulted in severe and recurrent headaches.

In its answer, defendant admitted that it placed steel posts in the vicinity of a customer exit door. It denied, however, that it was negligent in doing so and denied it breached any duty which it owed plaintiff. As an affirmative defense, K mart alleged negligence on the part of plaintiff which contributed in the whole or in part to the injuries of which he complained.

At trial, plaintiff presented testimony of medical experts to the effect that to a reasonable degree of medical certainty, the vision problems and headaches from which he suffers were probably caused by the October 11, 1985, accident at the K mart store. Plaintiff also presented the testimony of his wife, Gwendolyn G. Ward, concerning his medical problems since the accident at the K mart store and the embarrassment caused plaintiff by a scar on his left cheek which is attributable to the laceration which plaintiff sustained in the accident.

Testifying on his own behalf, plaintiff stated that he is 59 years old and is a self-employed parking lot designer and line striper. He had done work on the parking area of the K mart store at which he collided with the post, but had not done any work in the area of the door at which the mishap occurred. The plaintiff testified that on October 11, 1985, he went to a K mart store in Champaign in order to purchase a full-length bathroom mirror. He parked on the rear (east) side of the store and entered through a small pedestrian door located next to a large overhead door similar to a garage door. Plaintiff did

not recall using that door on previous occasions, although there was a possibility that he may have done so.

The mirror which plaintiff purchased on that day was 5 feet long and perhaps 1½ feet wide. The mirror was in a cardboard holder, but the face of the mirror was not covered.

Plaintiff completed his purchase of the mirror about one-half hour after he entered the store. He was not in any particular hurry on that day. After plaintiff paid for the mirror, a store clerk released a security lock, which permitted customers to exit the store through the door by which plaintiff had entered. (The door is apparently designed so that customers may freely enter through it during business hours, but as a shoplifting prevention measure, a security lock must be released in order for customers to exit through the door.) Plaintiff was carrying the mirror with both hands in a vertical position when he left the store, ''because I couldn't get through the door with it sideways.'' According to plaintiff, he put his left shoulder to the door, turned and walked out of the store. After taking a half to a full step outside the door, he ''just saw stars and [felt] a—a bad pain, and then some stars. That was the last that I recall.''

Plaintiff testified that the object with which he collided while exiting the store was a large post located close to the doorknob side of the pedestrian door. There is a similar post on the opposite side of the door. Plaintiff was not warned, by means of signs or otherwise, of the existence of the posts before he exited.

The door to the K mart store which plaintiff used on the day he was injured is 36 inches wide, and the posts on the sides of the door are also 36 inches apart. Both posts are located 19 inches from the building. When the door is opened to a position where its edge is nearest the post with which plaintiff collided, the door is four inches from the post. The posts are five feet four inches high. On the date of plaintiff's accident, both posts were painted dark brown. When leaving the store through the door in question, one must step down six inches.

The following exchange occurred concerning plaintiff's perception of the posts when he entered the store:

''Q. Did you see the posts as you entered?

A. Yes, sir. I mean they were there. Subconsciously, I guess—they were there when I went out, so, evidently, they were there when I went in.

Q. Did you make a mental note of the presence and existence of the posts as you went in?

* * *

A. Yes. I guess. I don't know. I mean—they were there. I just don't—."

Plaintiff stated that as he exited the store, he had no recollection of the existence of the posts.

As a result of his collision with the concrete post, plaintiff sustained a cut to his right cheek, and immediately after the incident, he could not see out of his right eye. Part of the vision in plaintiff's right eye has since returned, but the center vision in that eye is still obscured. Since the accident at the K mart store, plaintiff has regularly experienced severe headaches of a kind which he did not experience before the accident.

At the conclusion of his direct testimony, plaintiff stated that during the course of his work on parking lots (he has been involved in the construction of approximately 500 parking lots), he has never seen posts positioned in proximity to a pedestrian door similar to those at the K mart store at which he was injured.

On cross-examination, plaintiff stated that he usually enters the parking lot of the K mart store at which he was injured through the back way. He stated he experienced no difficulty in carrying the mirror which he purchased and requested no assistance in carrying it. When he left the cash register, plaintiff carried the mirror "[k]ind of to the side" and did not have it in front of his eyes. Plaintiff testified as follows concerning his encounter with the posts when he entered the store:

"Q. And you noticed these posts when you went inside, did you not?

A. Subconsciously.

Q. Well, would it be fair to say that you noticed them more or less, Yes?

A. More or less. Yes, sir.

Q. You didn't have trouble getting around those posts on the way in, did you, sir?

A. Not that I recall."

Plaintiff acknowledged that if the door had been fully open, he could have walked directly between the two posts. He also testified that he did not stumble when he started out through the door. Plaintiff admitted that the mirror blocked his view as he exited the store. He further stated that first the mirror, and then his head and face struck the concrete post.

On redirect examination, plaintiff stated that when he patronizes the K mart store at which he was injured, he normally parks on the front or west side of the store, and that the door from which he ex-

ited on the day he was injured is on the east side of the store. He further testified that the door stayed against his shoulder as he was pushing it open.

In K mart's answers to plaintiff's interrogatories which plaintiff introduced into evidence, K mart admitted that in 1979, it authorized installation of the steel posts by the door at which plaintiff was injured.

Kevin Endres, who on October 11, 1985, was employed in the home improvement center of the K mart store at which plaintiff was injured, testified on defendant's behalf. Endres stated that on any given day, the number of people who would use the door at which plaintiff was injured varied from 1 or 2 to 50. He stated that "for the most part, anybody buying large building materials, such as plywood, would use that back door, provided that they were aware of it."

Endres testified that as plaintiff left the cash register after purchasing the mirror, he was carrying it in a vertical position "above his eye sight" and "had it to one side, evidently so he could see." According to Endres, plaintiff did not request assistance with the mirror. Endres observed plaintiff until he stepped from the door onto the surface of the parking lot. Shortly thereafter, Endres heard a mirror break and saw a portion of one plaintiff's legs slipping out of the door opening. Endres went outside through the large garage-type door and saw plaintiff standing seven or eight feet from the closest portion of the door. Plaintiff said he was okay, but seemed somewhat in a daze. Endres observed a cut on one of plaintiff's cheeks, and another store employee began giving him first aid. Endres then called for the store manager and store security. Somewhat later, Endres heard plaintiff tell John Scott, the employee who gave him first aid, that he felt embarrassed and stupid. Up until October 11, 1985, Endres had never seen anyone injured as a result of using the door through which plaintiff exited.

Endres recalled that the mirror which plaintiff purchased was packaged in a cardboard wrapper, which fully covered its back and edges, and that possibly a carrying handle was built into one side of the cardboard, so that the mirror could be carried vertically. Endres felt that one carrying the mirror by the handle could have reached for the door, opened it and exited through it. Endres had seen people brush up against the posts located by the door through which plaintiff exited, but had never seen anyone hurt while going through that door.

On cross-examination, Endres stated that the nearby garage-type door was closed when plaintiff was injured. Endres further stated that when plaintiff exited the store, the door which he used was fully

opened to the point where it was about perpendicular to the wall. When Endres first saw plaintiff outside of the door after the accident, the package containing the mirror was located on the ground about two to three feet from the posts. Endres also stated that the door through which plaintiff exited has no windows, and that there are no signs inside warning of the posts by that door. Endres testified that when plaintiff paid for the mirror, he asked plaintiff if he needed any help with it, and plaintiff simply indicated that he wanted Endres to release the lock on the pedestrian door.

At the conclusion of the trial, the jury found for plaintiff and assessed plaintiff's damages at $85,000. The jury found plaintiff 20% negligent and accordingly fixed plaintiff's recoverable damages at $68,000.

Following the trial, the circuit court found that it should have allowed a motion for a directed verdict at the close of plaintiff's evidence, ruling on which was reserved at the conclusion of plaintiff's case. In so holding, the circuit court concluded that defendant had no reason to expect that plaintiff's attention would be distracted when he exited the door or that he would forget about the posts outside the door. The circuit court further stated that the posts in themselves did not constitute a danger and that they became dangerous only when acted upon by some external force. The court concluded that the only distractions were those induced by the plaintiff himself.

The court further held that although defendant owed plaintiff the duty of care owed to an invitee by a possessor of land, plaintiff's accident was not foreseeable. In support of this holding, the court stated:

> "The plaintiff knew of the posts and by his own actions brought about his injury by neglecting to take into account the possible obstacles into which he might run carrying a mirror in the fashion that he was. Had there been no posts but a person approaching the door from the outside at an angle where he would be in approximately the position of the posts the plaintiff would surely have done the same thing and hit him with the mirror rather than an inanimate post."

For these reasons, the circuit court entered a judgment *n.o.v.* in favor of defendant and against plaintiff.

■■ ■ In order for a court to allow a motion for judgment *n.o.v.*, all of the evidence, when viewed in its aspect most favorable to the opponent, must so overwhelmingly favor the movant that no contrary judgment based on that evidence could ever stand. (*Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 229 N.E.2d 504.) A plaintiff seeking to recover damages on the basis of alleged negligence must

establish a duty owed by the defendant to the plaintiff, a breach of that duty, and an injury proximately caused by the breach. *Mieher v. Brown* (1973), 54 Ill. 2d 539, 301 N.E.2d 307.

■ Whether a duty exists is an issue of law to be determined by the court. (*Wimmer v. Koenigseder* (1985), 108 Ill. 2d 435, 484 N.E.2d 1088.) The concept of duty, in the context of negligence actions, has always been rather nebulous. In describing the concept, the court in *Mieher* stated:

> "The term is so ill-defined and its boundaries so indistinct that one commentator has observed: 'There is a duty if the court says there is a duty.' And he concluded that the court's pronouncement often reflects the policy and social requirements of the time and community. Prosser, Palsgraf Revisited, 52 Mich. L. Rev. 1, 15; see also Prosser, Law of Torts (4th ed. 1971) 325-26." (*Mieher*, 54 Ill. 2d at 545, 301 N.E.2d at 310.)

The reasonable foreseeability of injury is a "key concern" in determining whether a duty exists, but it is not the only factor. Additional considerations are "the likelihood of injury, the magnitude of the burden of guarding against it and the consequences of placing that burden upon the defendant." *Kirk v. Michael Reese Hospital & Medical Center* (1987), 117 Ill. 2d 507, 526, 513 N.E.2d 387, 396, *cert. denied* (1988), 485 U.S. 905, 99 L. Ed. 2d 236, 108 S. Ct. 1077.

Both parties agree that the law applicable to a business' duty to take measures to protect its customers from harm while on its premises is stated in sections 343 and 343A of the Restatement (Second) of Torts (Restatement (Second) of Torts §§343, 343A (1965)). (See *Genaust v. Illinois Power Co.* (1976), 62 Ill. 2d 456, 343 N.E.2d 465.) In relevant part, these sections provide:

> "Dangerous Conditions Known to or Discoverable by Possessor
>
> A possessor of land is subject to liability for physical harm caused to his invitees by a condition on the land if, but only if, he
>
> (a) knows or by the exercise of reasonable care would discover the condition, and should realize that it involves an unreasonable risk of harm to such invitees, and
>
> (b) should expect that they will not discover or realize the danger, or will fail to protect themselves against it, and
>
> (c) fails to exercise reasonable care to protect them against the danger." (Restatement (Second) of Torts §343, at 215-16 (1965).)
>
> "Known or Obvious Dangers

(1) A possessor of land is not liable to his invitees for physical harm caused to them by any activity or condition on the land whose danger is known or obvious to them, unless the possessor should anticipate the harm despite such knowledge or obviousness.

(2) In determining whether the possessor should anticipate harm from a known or obvious danger, the fact that the invitee is entitled to make use of public land, or of the facilities of a public utility, is a factor of importance indicating that the harm should be anticipated." (Restatement (Second) of Torts §343A, at 218 (1965).)

"Comment ***:

* * *

*e.* In the ordinary case, an invitee who enters land is entitled to nothing more than knowledge of the conditions and dangers he will encounter if he comes. If he knows the actual conditions, and the activities carried on, and the dangers involved in either, he is free to make an intelligent choice as to whether the advantage to be gained is sufficient to justify him in incurring the risk by entering or remaining on the land. The possessor of the land may reasonably assume that he will protect himself by the exercise of ordinary care, or that he will voluntarily assume the risk of harm if he does not succeed in doing so. Reasonable care on the part of the possessor therefore does not ordinarily require precautions, or even warning, against dangers which are known to the visitor, or so obvious to him that he may be expected to discover them.

Illustration:

1. The A Company has in its store a large front door, made of heavy plate glass. The door is well lighted and plainly visible, and its existence is obvious to any person exercising ordinary attention and perception. B, a customer in the store, while preoccupied with his own thoughts, mistakes the glass for an open doorway, and runs his head against it and is injured. A Company is not liable to B.

*f.* There are, however, cases in which the possessor of land can and should anticipate that the dangerous condition will cause physical harm to the invitee notwithstanding its known or obvious danger. In such cases the possessor is not relieved of the duty of reasonable care which he owes to the invitee for his protection. This duty may require him to warn the invitee, or to take other reasonable steps to protect him, against the

known or obvious condition or activity, if the possessor has reason to expect that the invitee will nevertheless suffer physical harm." Restatement (Second) of Torts §343A, Comment, at 218-20 (1965).

Here plaintiff, while preoccupied with an item which he purchased at defendant's store, bumped into a permanent fixture on the premises, which he had observed on his way into the store.

The actions of the plaintiff in this case are somewhat similar to those of the plaintiff in *Rosenberg v. Hartman* (1943), 313 Mass. 54, 46 N.E.2d 406. There, a customer entered a store through an open door. Upon leaving the store, he walked into the door, which in the meantime had been closed and which he failed to see on his way out, and was injured. The door consisted of one large pane of practically transparent glass, and there was virtually nothing to interfere with its complete transparency. However, the door was in no way out of repair and its handles, lock, and fittings were in plain sight. In holding that an intermediate appellate court properly reversed a judgment for the plaintiff, the court stated:

> "A door of this kind is to be classed with other forms of construction such as various types, whether new or old, of doors, floors, stairs, and ramps, not out of repair, upon which it is possible for an invitee to receive injury, but which are not of such a character that danger is reasonably to be anticipated from them to persons exercising ordinary care." *Rosenberg*, 313 Mass. at 55, 46 N.E.2d at 406.

Similarly, in *Snyder v. Ginn* (1960), 202 Va. 8, 116 S.E.2d 31, the plaintiff was injured when she walked through a plate glass window adjacent to an inner door of a department store. Each set of doors consisted of clear glass which was framed in metal, with a metal crossbar handle extending across the middle of their full width. Before leaving the store, the plaintiff stopped to look at some jewelry at a counter immediately in front of the doorway. Upon stepping away from the counter, the plaintiff observed only the outside set of doors and did not observe the inside set of doors. She admitted that if she had been looking straight ahead, she would have seen the inside doors as distinguished from the adjacent glass panels. Noting that the location and condition of the inside doors were completely open and obvious to anyone looking in their direction, the court held that there was no evidence of negligence on the part of the store owner. On this basis, the court reversed a judgment in favor of the plaintiff.

The Illinois cases on which plaintiff mainly relies are factually distinguishable from the case at bar. The defectively designed stairways

involved in *Allgauer v. Le Bastille, Inc.* (1981), 101 Ill. App. 3d 978, 428 N.E.2d 1146, and *Erne v. Peace* (1987), 164 Ill. App. 3d 420, 517 N.E.2d 1203, as well as the dangers inherent in the defectively designed metal cutting machine in *Derrick v. Yoder Co.* (1980), 88 Ill. App. 3d 864, 410 N.E.2d 1030, were less obvious than the concrete post with which plaintiff collided. In contrast to the pile of lumber which caused injury to a youth who had climbed upon it in *Kahn v. James Burton Co.* (1955), 5 Ill. 2d 614, 126 N.E.2d 836, and the hole in the floor of a house under construction which was to contain a basement stairway and caused the plaintiff's injuries in *Shaffer v. Mays* (1986), 140 Ill. App. 3d 779, 489 N.E.2d 35, the concrete posts were a permanent condition which had been in existence for several years when plaintiff was injured.

Under the circumstances of this case, defendant could not reasonably have been expected to foresee that one of its customers would block his vision with an object which he had purchased and fail to see a five-foot-tall concrete post located outside of an entrance to its store. The steel posts were not a hidden danger. Although the cost of providing warnings of or removing the concrete posts in question probably would have been slight, the cost of taking like measures with respect to other similar objects with which inattentive customers could possibly collide would indeed be great.

For the foregoing reasons, we hold that defendant did not owe plaintiff a duty under the facts of this case, regardless of whether plaintiff's theory of liability is premises liability or negligent creation of a hazardous condition. Because we decide defendant owed plaintiff no duty, we need not consider the additional reasons which defendant advances for upholding the circuit court's judgment *n.o.v.*

The judgment *n.o.v.* in favor of defendant K mart Corporation is affirmed.

Affirmed.

GREEN, J., concurs.

JUSTICE LUND, dissenting:

As stated in the majority opinion when referring to section 343A of Restatement (Second) of Torts, K mart was not liable to plaintiff, invitee, from the danger known to him or obvious to him unless K mart should anticipate the harm, despite the knowledge or obviousness.

The plaintiff entered the same door he exited, the location of the

accident. Customers regularly used the exit, and there was no warning on the exit side of the entrance of the posts located immediately outside the door. The two posts were close to the door and could easily block a person carrying a large box or package. If plaintiff had entered the main door, never having been near the service exit door, liability for creation of a dangerous situation would certainly have been upheld.

Plaintiff's own testimony indicated his knowledge of the posts was based upon his belief that he must have seen them when he entered the door. I challenge the majority to say, after they have entered a retail establishment, that they remember the nature of the entry construction, as well as possible obstructions.

In *Allgauer v. Le Bastille, Inc.* (1981), 101 Ill. App. 3d 978, 428 N.E.2d 1146, the plaintiff fell on steps when leaving the restaurant. The court rejected defendant's argument that knowledge based on the fact she had entered the same entrance, as a matter of law, barred recovery. The court held this matter had no bearing on whether the defendant had a duty to give warnings, and was only relevant as to the issue of contributory negligence.

The defendant was a retailer and sold large items, carried out of the store by customers. It was within the realm of the jury's discretion to hold K mart should have anticipated harm despite plaintiff's having entered the obstructed doorway. We should reverse, mandating reinstatement of the jury verdict.