Dwight PARKS, Respondent,

v.

ALLIS–CHALMERS CORPORATION,
formerly Allis-Chalmers Manufac-
turing Company, Appellant.

No. 48629.

Supreme Court of Minnesota.

Nov. 2, 1979.

As Modified on Rehearing Denied
Feb. 7, 1980.

Popham, Haik, Schnobrich, Kaufman & Doty, G. Marc Whitehead and Desyl· L. Peterson, Minneapolis, for appellant.

Cann, Schmidt, Weddel & Haskell, James W. Haskell, and Douglas W. Cann, Bemidji, for respondent.

Heard before OTIS, PETERSON and KENNEDY, JJ., and considered and decided by the court en banc.

CHARLES W. KENNEDY, Justice.*

Plaintiff, Dwight Parks, lost part of his right arm when he was unclogging corn stalks in a forage harvester manufactured by defendant, Allis-Chalmers Corporation. His action for damages was submitted as a claim for negligence, and the jury found that defendant was 51 percent negligent, plaintiff was 49 percent negligent, and plaintiff's damages were $143,000. Judgment was entered for plaintiff for $72,930 and interest and costs. On appeal from the judgment and from denial of its post-trial motion, defendant contends that the finding that it was negligent is not justified by the evidence, or that as a matter of law plaintiff's negligence was as great as any negligence of defendant,[1] and that the trial court erred in refusing requested instructions. We conclude that because jury questions were presented, the trial court did not err in refusing to find plaintiff more negligent as a matter of law, and there was no reversible error in the rulings on requested instructions. Therefore, we affirm.

The forage harvester consisted of a base unit with a power takeoff connection and a row crop attachment or corn head, both manufactured by defendant, the base unit in 1954 and the row crop attachment or corn head a few years earlier. The harvester was pulled by a tractor and powered by a tractor power takeoff. Mr. Verne Parks, Jr., plaintiff's father, purchased the used

---

* Acting as Justice of the Supreme Court by appointment pursuant to Minn.Const. art. 6, § 2, and Minn.Stat. § 2.724, subd. 2 (1978).

1. Minn.Stat. § 604.01 (1976) was applicable.

harvester in 1959. It was then equipped with a grass attachment. In the late 1960's, he purchased the used pre-1954 row crop attachment. With aid of a manual obtained from an Allis-Chalmers dealer, Mr. Parks removed the grass attachment and put on the row crop attachment.

When the harvester moved down a row of corn, a sickle blade severed the corn stalks and gathering chains carried the stalks to the top of the corn head where they passed through a transition space into feed rolls. The feed rolls fed them to other rolls that compressed the stalks and fed them to a cylinder of cutting knives, which chopped the stalks into ensilage. Because of slippage, the feed rolls did not always take the stalks in at the same speed. In normal use of the harvester, corn stalks occasionally would become clogged in the chains at the top of the corn head before reaching the feed rolls. No mechanism was provided for unclogging. A feed-roll safety clutch protected the rolls and the cutting cylinder from overload or rocks. A reversing bar was provided for manually turning the feed rolls to remove an obstruction. A stalk-chute door opened into the area at the top of the corn head and the feed rolls and furnished access to that area for cleaning, unclogging, and repair. On this door was a visible sign:

WARNING

KEEP AWAY FROM ROLLS

UNLESS POWER IS OFF

A sign on the right rear of the harvester said:

BE CAREFUL

\* \* \* \* \* \*

3. WHEN MECHANISM BECOMES CLOGGED, DISCONNECT BEFORE CLEANING
4. KEEP HANDS, FEET AND CLOTHING AWAY FROM POWER-DRIVEN PARTS

The manual contained the "BE CARE-FUL" sign information that was on the harvester and a five-paragraph "CAUTION" which included:

3. WHEN MECHANISM BECOMES CLOGGED DISCONNECT POWER BEFORE CLEANING to avoid all possibilities of being seriously injured by the feeder rolls, cutter knives or other moving parts.
4. KEEP HANDS, FEET AND CLOTHING AWAY FROM POWER DRIVEN PARTS to prevent serious accidents.

To unclog stalks jammed at the top of the corn head, the operator had to leave the tractor seat, open the stalk-chute door, reach into the clogged stalks at a point about a foot from the feed rolls and pull at the stalks. When the power was disconnected, the gathering chains and feed rolls furnished no assistance in loosening and moving the stalks. Plaintiff testified that with the power off it was "hard to unplug \* \* \*. You can't hardly pull them out of there. \* \* \* When you unplug it that way, you got the corn stalks laying on the ground \* \* \*. And you have got to pick them back up and feed them back through the door." This method of unclogging usually took five to ten minutes or longer.

When the power was connected, unclogging was easier and quicker. Plaintiff testified he would "open the door and get the stalks, just get a few stalks going, and away she would go. \* \* \* I would reach in and work some of them loose, one or two whatever it took. And then it most generally would take if it wasn't backed up more, oh, thirty seconds, maybe two minutes." Plaintiff and his father had unclogged the stalks with the power on many times without incident.

On September 14, 1974, plaintiff, 24 years of age, familiar with the harvester from having used it many times over a couple of years at least, and aware of the warnings on the harvester and in the manual, was making normal use of the harvester. In about an hour and a half, he unclogged stalks four or five times with the power

connected. When unclogging became necessary again, he reduced the power slightly, left the tractor and power takeoff running, opened the stalk-chute door, looked in and saw stalks clogged, but not touching the feed rolls. He reached in with his right arm, got hold of some stalks, felt a quick jerk and his arm was in the machine. The arm had to be amputated above the elbow.

█ 1. It was defendant's duty to use reasonable care in design of the harvester to protect users from unreasonable risk of harm while using it in a foreseeable manner. *Lovejoy v. Minneapolis-Moline Power Implement Co.*, 248 Minn. 319, 79 N.W.2d 688 (1956); Restatement of Torts 2d § 398 (1965); JIG II 403 G–S. Defendant knew that in normal use of the harvester an operator would sometimes have to unclog corn stalks in the area at the top of the row crop attachment near the feed rolls.[2] There was evidence that a mechanical means of reversing the chains to aid in unclogging, which could be operated from the driver's seat on the tractor, was feasible when the harvester was manufactured. Defendant furnished no mechanical means to aid in unclogging. Therefore, defendant knew that some way of manual unclogging, as decided upon by users, would be necessary. The jury could find that defendant knew, or in the exercise of reasonable care should have known, that some users would leave the power connected while unclogging because that would furnish mechanical assistance, saving time and effort. Defendant could foresee that manual unclogging with the power connected would involve an operator handling corn stalks in an area about a foot from the whirling feed rolls, an area accessible through the stalk-chute door which could be opened whether the power was on or off. The machine was not equipped with a safety interlock device to prevent opening the chute door while the power was connected. There was expert testimony that an interlock device was feasible at the time of manufacture.[3]

█ It was for the jury to determine whether defendant, knowing that manual unclogging would be required and that some users would leave the power connected while unclogging and thereby incur a risk of harm, exercised reasonable care with a machine design which presented no obstacle to unclogging with the power connected.

There was evidence that years of use had impaired the harvester somewhat and that plaintiff's father made some errors when he put on the row crop attachment. The jury could find that except as usage and maintenance may have affected clogging or slippage, the wear and tear and maintenance were not material to the issues of negligence and contributory negligence. Usage and maintenance had nothing to do with the absence of any mechanical unclogging assistance or the absence of any safety interlock device.

The evidence was in dispute as to whether wear and tear and maintenance and design affected clogging. The evidence does not establish as a matter of law that the harvester would not have clogged but for wear and tear and maintenance. In any event, a finding that at the time of planning and manufacture defendant anticipated clogging from a variety of conditions and could foresee that unclogging as experienced by plaintiff would be required in ordinary use of the harvester is justified by the evidence.

The extent to which wear and tear and maintenance and design may have contributed to the degree of slippage was a question of fact. It cannot be ruled as a matter of law that defendant could not reasonably foresee the kind of slippage that may have occurred during use by plaintiff.

2. Defendant's employee, Paul Whisler, an agricultural engineer who had worked on the design of this kind of harvester for defendant, testified: "It is normal for all machines I have ever seen, including the ones I made, to plug up under some conditions."

3. Defendant's awareness that some users would unclog with the power connected is demonstrated by the testimony of defendant's engineer, Mr. Whisler, to the effect that one reason a safety interlock device was not furnished was that defendant believed users would remove such a device.

The jury could reasonably conclude that a problem which use of the harvester presented, so far as clogging and unclogging were concerned, was substantially the same at the time of injury as at the time of manufacture: the occasional necessity for unclogging corn stalks, the absence of any mechanical assistance so that manual unclogging was required, the temptation to a user to leave the power connected for quicker and easier unclogging, a design which did not impede that manner of use, and the resulting exposure of the operator to risk of harm.

■ Since defendant could reasonably foresee that the harvester would at times be used in an improper manner, it was defendant's duty to exercise reasonable care to warn or instruct as to dangers inherent in that manner of use. *Frey v. Montgomery Ward & Co., Inc.,* 258 N.W.2d 782 (Minn.1977); *Johnson v. West Fargo Mfg. Co.,* 255 Minn. 19, 95 N.W.2d 497 (1959); *Lovejoy v. Minneapolis-Moline Power Implement Co., supra* ; Restatement of Torts 2d § 394; JIG 405 G–S.[4]

Defendant instructed that the power should be disconnected before cleaning when the mechanism became clogged, but furnished no other instructions about unclogging. There was no instruction that if the power was not disconnected as instructed, manual unclogging presented the danger that a surge in the speed of the rollers could yank a stalk so fast that a human could not release it in time to avoid injury.

Since the danger was inherent in a foreseeable manner of use, the jury could find that defendant failed to exercise reasonable care to adequately instruct about that danger.

2. The jury attributed 49 percent of the fault to plaintiff. The contention that the court should change that to 50 percent or more, as a matter of law, presents a question as to the sufficiency of the evidence to support the jury's apportionment.[5]

■ There was a dispute as to plaintiff's knowledge of the particular danger that resulted in injury. Defendant argues that plaintiff "deliberately encountered a known and obvious risk in conscious disregard of defendant's warnings." The evidence does not prove that alleged fact as a matter of law. There was credible testimony that plaintiff did not know that the speed of the rolls could vary and might suddenly increase so that he could not let go of a stalk before his hand was in the rollers.[6] His prior use of the machine had not made him aware of that danger.[7]

Among other considerations available from the evidence, the jury could conclude that defendant's failure to furnish design interference with a dangerous manner of use, reasonably foreseeable, and its reliance upon warning and instruction which failed to mention a particular danger involved in that manner of use, made defendant more at fault than was plaintiff.

■ Since there is evidence to support the jury's apportionment of fault, it cannot be disturbed.

4. "If a manufacturer of goods uses printed instructions to advise persons as to the proper use of the goods, he has a duty to use reasonable care to give accurate and adequate instructions with respect to such use and as to dangers inherent in using the article in an improper manner which the manufacturer should reasonably foresee." JIG II 405 G–S.

5. "In reviewing a jury's apportionment of negligence, we are governed by the same standards as are applied in reviewing other jury findings, that is, we will not substitute our judgment for that of the jury unless there is no evidence reasonably tending to sustain the apportionment, or the apportionment is manifestly and palpably against the weight of the evidence. *Martin v. Bussert,* 292 Minn. 29, 37, 193 N.W.2d 134, 139 (1971). The apportionment

should be left to the jury, except where there is no dispute in the evidence and the factfinder could come to only one conclusion. *Riley v. Lake,* 295 Minn. 43, 203 N.W.2d 331 (1972)." *Duchene v. Wolstan,* 258 N.W.2d 601, 605 (Minn.1977).

6. There was evidence that the speed of the rollers could be 46⅔ inches per second and that the peak reaction time for a person plaintiff's age is ¾ths of a second.

7. Past experience with a product does not necessarily alert users to all of the dangers associated with the product. *Blasing v. P.R.L. Hardenbergh Company,* 303 Minn. 41, 48, 226 N.W.2d 110, 115 (1975).

■ 3. There was no error in the refusal of requested instructions. The usual questions for determination of comparative negligence issues by special verdict were submitted to the jury. Requests for instructions declaring generally in what circumstances defendant would not be liable or plaintiff could not recover were properly denied as inappropriate to submission by special verdict.

■ The request that a manufacturer is not negligent if its product is safe when used in accordance with the manufacturer's instructions or warnings does not take into account the manufacturer's duty of reasonable care with respect to a foreseeable use which is not covered by the warnings or instructions furnished. *See, Frey v. Montgomery Ward & Co., supra*, at 788.

■ The request that "there is no duty to install additional safety devices if the risk is (1) obvious (2) known by the user and (3) specifically warned against" was not appropriate. It assumed, contrary to the evidence, that some safety device or devices, material to the particular risk involved, had been installed, and that there had been a specific warning about the particular danger that caused the injury.

. Affirmed.

PETERSON, J., having participated in the oral argument, withdrew and did not participate in the decision.

OTIS, Justice (dissenting).

I cannot agree that a manufacturer may be held liable for the willful, intentional and calculated risk taking of a mature and intelligent adult who was, or should have been, fully aware of the dangers to which he was exposed. This plaintiff was seriously injured when he ignored all of the conspicuous warnings with which he was familiar and refused to follow the manufacturer's directions.

It is impossible to design a safety device which is so foolproof it cannot be circumvented by an ingenious and impatient operator. We are not here considering an injury to an immature and inexperienced or illiterate farmer. As my brother Kennedy points out, plaintiff was "24 years of age, familiar with the harvester from having used it many times over a couple of years at least, and aware of the warnings on the harvester and in the manual." Even if plaintiff had not seen and read the warnings to "Keep away from rolls unless power is off * * * Be careful * * * When mechanism becomes clogged, disconnect before cleaning * * * Keep hands, feet and clothing away from power-driven parts", it is difficult to imagine a more obvious danger than exposed rollers with teeth rotating at 46⅔ inches per second.

We have a duty to impose some limits on a manufacturer's obligation to prevent foolhardy behavior. It is one thing to anticipate latent dangers lurking in the use of unfamiliar and potentially dangerous equipment by unsophisticated householders or children who are by nature curious. It is quite another to anticipate and prevent those who have had long experience with inherently dangerous machines from deliberately risking life and limb by ignoring open and obvious hazards in order to save a few moments of their time.

The effect of this proposed decision is to relieve the user of dangerous equipment from responsibility for his own safety if he can show (a) that it is more convenient to take the risk than to avoid it, and (b) that the manufacturer did not produce a machine which made it impossible for the user to outwit the engineers who designed the built-in safety devices.

To hold that a manufacturer is liable for failing to anticipate every misuse or abuse of its product imposes an impossible burden on industry which I cannot endorse.

I would hold that plaintiff's degree of comparative negligence exceeded that of defendant as a matter of law and would reverse.

KELLY, Justice (dissenting).

I join in the dissent of Mr. Justice Otis.

PETERSON and TODD, JJ., took no part in the consideration or decision of this case.

The petition for rehearing correctly points out that the speed of the rollers did not change. What could vary was the rate of speed of the corn stalks as they were drawn into the rollers. The correction does not change the nature of the risk of harm to an operator nor affect the application of controlling legal principles. The petition for rehearing is denied.