**Arnold HOLM, Appellant,**

v.

**SPONCO MFG., INC., et al.,**
**Respondents.**

**No. 81–1133.**

Supreme Court of Minnesota.

Aug. 31, 1982.

---

Larkin, Hoffman, Daly & Lindgren, Joseph W. Anthony and Andrew J. Mitchell, Minneapolis, for appellant.

Meagher, Geer, Markham, Anderson, Adamson, Flaskamp & Brennan, R. Gregory Stephens and James F. Roegge, Minneapolis, for respondents.

YETKA, Justice.

Appellant Holm was severely injured on September 10, 1973, when he came in contact with a high voltage power line while operating an aerial ladder manufactured by the respondent, Sponco Mfg., Inc. Holm commenced a lawsuit against Sponco alleging negligence and strict products liability. Appellant stipulated that the danger of electrocution from contact with a high voltage wire was obvious, that he knew of the danger, and that he was familiar with warning decals on the machine which warned against the specific hazard which caused his injury. The Hennepin County District Court granted Sponco's motion for summary judgment, concluding that the rule of law in *Halvorson v. American Hoist and Derrick Co.*, 307 Minn. 48, 240 N.W.2d 303 (1976), was controlling. Appellant appeals from that order and the entry of judgment thereon. We reverse and remand for trial.

At the time of the accident, Arnold Holm was a 58-year-old employee of Naegele Advertising, Inc.[1] Approximately 80% of his

---

1. The following summary of facts is condensed from the stipulation agreed to by the parties for purposes of Sponco's summary judgment motion.

time was spent working as an electrician's assistant where his primary duty was to install light fixtures on Naegele's billboards so they could be illuminated at night. On September 10, 1973, Laval Hylback, an electrician, and appellant Holm were assigned to prepare an advertising billboard for illumination by mounting light fixtures on the billboard. The advertising billboard was located on Highway 12 between Tamarach Avenue and Brimhall Avenue on the west end of Long Lake, Minnesota. The billboard was approximately 25 feet high; within 16 feet of the billboard was a high voltage electrical line approximately 31 feet off the ground. In order to attach the fixtures, Holm and Hylback were required to use an aerial ladder purchased by their employer from Sponco.

The aerial ladder had an automatic worker's platform at the top section of the ladder with a remote control device which permitted operation of the ladder from the platform. The remote control device consisted of a series of four (4) toggle switches which, when pressed, caused the ladder to move up, down, left, or right.

Holm was familiar with the aerial ladder. He had received instructions on the use of it from Naegele employees. He had used this or a similar aerial ladder for 3 years, during which time he had operated it more than 2,000 times. Moreover, Holm maintained that he was familiar enough with the controls that he could operate the ladder without looking at the control panel direction labels. Prior to September 10, 1973, Holm had had difficulty positioning the aerial ladder. Specifically, when moving the ladder to a designated spot, the ladder "carried over" or drifted after the power was discontinued. However, Holm had learned to work with the ladder so that the drifting was not a problem.

Holm had worked with the aerial ladder on billboards near electrical lines on prior occasions. He knew that the aerial ladder was not insulated. Holm was aware that he could be electrocuted if he or the ladder came in contact with an electrical line.

Holm acknowledged that it was his practice to avoid the electrical lines by at least 15 feet. Holm was also aware of the various warning labels on the aerial ladder and truck and, in particular, of the 10 and 15 feet clearance recommendations.

At approximately 10:00 a.m., Hylback and Holm extended the aerial ladder such that they could climb up the ladder to the top of the billboard. Using the aerial ladder, the two men maneuvered one 18-foot long fixture up to the top of the billboard and began to bolt the fixture in place. Holm's intentions were to ride the ladder to the ground, controlling it by using the remote control device on the platform, to pick up the second 18-foot fixture that would be required to complete the job, and to return to the top of the billboard. In returning to the ground, Holm maneuvered the aerial ladder and the automatic worker's platform on which he was standing in a clockwise, northeasterly direction. While doing so, he struck the electrical powerline with his right arm below the shoulder.

In opposition to Sponco's motion for summary judgment, Holm filed an affidavit of an expert witness, testifying that the aerial ladder was defective and unreasonably dangerous because it lacked safety devices such as insulation, sensors, and other limiting or proximity warning devices which would have either warned appellant of the proximity of the electrical wires or would have prevented the electrical current from passing through appellant to ground. Sponco's expert also indicated that it was not a reasonable engineering practice to fail to include such safety devices where it was foreseeable that the aerial ladder would be used near electrical wires.

The issue raised on this appeal is whether the manufacturer of an aerial ladder in a defective condition unreasonably dangerous to the user is liable to the user if that defective condition is obvious.

In *Halvorson v. American Hoist and Derrick Co.,* 307 Minn. 48, 240 N.W.2d 303 (1976), this court appeared to have adopted

the latent-patent danger rule which relieves a manufacturer from liability if the dangers of his product are obvious to the user. Comment, *Obviousness of Product Dangers as a Bar to Recovery: Minnesota Apparently Adopts the Latent-Patent Doctrine,* 3 Wm. Mitchell L.Rev. 241 (1977). In *Halvorson,* the court held that a manufacturer does not owe an injured plaintiff "any duty to install safety devices on its crane to guard against the risk of electrocution when the record demonstrated that [the] risk was: (1) obvious; (2) known by all employees involved; and (3) specifically warned against * * *." 307 Minn. at 57, 240 N.W.2d 308.

Appellant requests that *Halvorson* be directly overruled, contending (1) that it already has been implicitly overruled, (2) that the latent-patent rule is inconsistent with the current trend in products liability law, (3) that the policy considerations underpinning strict product liability are not served by adherence to *Halvorson,* and (4) that the latent-patent rule alters the basic allocation of liability under Minnesota's comparative fault statute. Respondent argues that the rule of law laid down in *Halvorson* is logical and fair by requiring "that the user of the product should, in the final analysis, be held accountable for his own conduct in the use of the product in the face of obvious and known risks." The district court found that the stipulated facts compelled the grant of respondent's motion for summary judgment based on *Halvorson.* The court expressed doubt as to *Halvorson's* continued validity, however, and appeared to invite reversal by this court. We agree with the district court's excellent analysis of the law contained in its memorandum accompanying its order.

A succinct statement of the latent-patent rule is found in *Campo v. Scofield,*[2] 301 N.Y. 468, 95 N.E.2d 802 (1950):

[T]he manufacturer of a machine or any other article, dangerous because of the way in which it functions, and patently so, owes to those who use it a duty merely to make it free from latent defects and concealed dangers.  * * *

If a manufacturer does everything necessary to make the machine function properly for the purpose for which it is designed, if the machine is without any latent defect, and if its functioning creates no danger or peril that is not known to the user, then the manufacturer has satisfied the law's demands.

*Id.* at 471–72, 95 N.E.2d at 803–04. Citing *Campo,* the *Halvorson* court concluded that the plaintiff, as a matter of law, could not recover for defective product design under either a strict liability or negligence theory because the danger was obvious. *Halvorson,* 307 Minn. 48, 57, 240 N.W.2d 303, 308 (1976).

Since *Halvorson,* the position of this court on the obviousness question has been uncertain. In *Ferguson v. Northern States Power Co.,* 307 Minn. 26, 239 N.W.2d 190 (1976) (decided a week before *Halvorson* ), plaintiff was a teen-age boy who was severely injured when he accidentally contacted an 8,000 volt uninsulated electrical transmission line while trimming a tree in his father's backyard. The court refused to bar recovery, noting instead that although the ordinary city dweller (including plaintiff) would know that the overhead utility lines in the backyard transmitted electricity, "he should [not] be expected to anticipate the presence of a such a lethal charge * * *." *Id.* at 33, 239 N.W.2d at 194. Thus, while the *danger* was obvious, the *extent* of the danger was not.

In *Goblirsch v. Western Land Roller Co.,* 310 Minn. 471, 246 N.W.2d 687 (1976), the plaintiff lost his right hand while attempting to push wet corn down the intact chute

---

**2.** The plaintiff, whose hands became caught in the steel rollers of an onion-topping machine, brought suit against the machine's manufacturer, alleging that available safety devices would have reduced or prevented his injuries. The New York Court of Appeals upheld the dismissal of plaintiff's complaint because the existence of a latent defect was not alleged. *Campo* was overruled by that same court within a matter of weeks after the *Halvorson* case was filed. *See Micallef v. Miehle Co.,* 39 N.Y.2d 376, 348 N.E.2d 571, 384 N.Y.S.2d 115 (1976).

of a corn-grinding machine, a task he had performed many times. Without reference to *Campo* or *Halvorson,* and without discussion of the apparently obvious danger, a jury verdict for the defendant was upheld based on plaintiff's assumption of the risk.

In *Bigham v. J.C. Penney Co.,* 268 N.W.2d 892, 896 (Minn. 1978), we approved the Eighth Circuit's analysis of *Halvorson* found in *Bjerk v. Universal Engineering Corp.,* 552 F.2d 1314 (8th Cir. 1977). In *Bjerk,* the plaintiff was injured after crawling under a metal guard in order to grease a rock-crushing machine while it was operating. The instruction manual specifically warned against greasing the crusher while in motion. Although the manufacturer argued that *Halvorson* was controlling, the court distinguished *Halvorson* and determined that the danger was not obvious as a matter of law. Consequently, the issue of defendant's negligence in failing to design and install safety devices adequately or to provide an adequate warning was a fact question for the jury.

The continued validity of *Halvorson* is further clouded by *Parks v. Allis-Chalmers Corp.,* 289 N.W.2d 456 (Minn. 1979). In *Parks,* plaintiff was injured when his arm was pulled into a forage harvester. At the time of the injury, plaintiff was attempting to unclog the harvester mechanism through an open stalk-chute door. The power take-off was still on. A sign on the stalk-chute door told the operator to "keep away from rolls unless power is off." A second sign on the harvester warned the operator to "keep hands, feet and clothing away from power-driven parts."

Defendant requested a jury instruction, apparently based on *Halvorson,* that "there is no duty to install additional safety devices if the risk is (1) obvious, (2) known by the user, and (3) specifically warned against." The refusal to give the requested instruction was affirmed because the instruction "assumed, contrary to the evidence, that some safety device or devices, material to the particular risk involved, had been installed, and that there had been a specific warning about the particular dan-

ger that caused the injury." *Id.* at 461. The court also indicated that there was credible testimony indicating that plaintiff did not know of the particular danger which caused his injury. *Id.* at 460.

Finally, in *Allied Aviation Fueling Co. v. Dover Corp.,* 287 N.W.2d 657 (Minn. 1980), the court cited *Halvorson* for the proposition that the failure of a manufacturer to design against a foreseeable misuse was not the proximate cause of plaintiff's loss because plaintiff had prior knowledge of the result of such misuse. The plaintiff's knowledge of the potential danger, rather than the obviousness of the defect, was the basis for denying recovery.

The result of all these cases might well appear to be a confusing set of decisions from which the bar could find that the court appears to be looking for a way to avoid the harsh result of *Campo* while retaining the three-part test of *Halvorson.*

The current trend in products liability law has been accurately summarized by the Florida Supreme Court:

> The modern trend in the nation is to abandon the strict patent danger doctrine as an exception to liability and to find that the obviousness of the defect is only a factor to be considered as a mitigating defense in determining whether a defect is unreasonably dangerous and whether plaintiff used that degree of reasonable care required by the circumstances.

*Auburn Machine Works Co. v. Jones,* 366 So.2d 1167, 1169 (Fla.1979). The latent-patent danger doctrine has been abandoned in a number of jurisdictions. *See, e.g., Davis v. Fox River Tractor Co.,* 518 F.2d 481 (10th Cir. 1975) (applying Oklahoma law); *Beloit Corp. v. Harrell,* 339 So.2d 992 (Ala.1976); *Byrns v. Riddell, Inc.,* 113 Ariz. 264, 550 P.2d 1065 (1976); *Pike v. Frank G. Hough Co.,* 2 Cal.3d 465, 467 P.2d 229, 85 Cal.Rptr. 629 (1970); *Auburn Machine Works Co. v. Jones,* 366 So.2d 1167 (Fla.1979); *Brown v. Clark Equipment Co.,* 62 Haw. 530, 618 P.2d 267 (1980); *Derrick v. Yoder Co.,* 88 Ill. App.3d 864, 43 Ill.Dec. 897, 410 N.E.2d 1030 (1980); *Uloth v. City Tank Corp.,* 376 Mass. 874, 384 N.E.2d 1188 (1978); *Casey v. Gif-*

ford Wood Co., 61 Mich.App. 208, 232 N.W.2d 360 (1975); *Thibault v. Sears, Roebuck & Co.,* 118 N.H. 802, 395 A.2d 843 (1978); *Ferrigno v. Eli Lilly and Co.,* 175 N.J.Super. 551, 420 A.2d 1305 (1980); *Micallef v. Miehle Co.,* 39 N.Y.2d 376, 348 N.E.2d 571, 384 N.Y.S.2d 115 (1976); *Olson v. A.W. Chesterton Co.,* 256 N.W.2d 530 (N.D. 1977); *Palmer v. Massey-Ferguson, Inc.,* 3 Wash. App. 508, 476 P.2d 713 (1970).

As pointed out by the New York Court of Appeals in overruling *Campo:*

> *Campo* suffers from its rigidity in precluding recovery whenever it is demonstrated that the defect was patent. Its unwavering view produces harsh results in view of the difficulties in our mechanized way of life to fully perceive the scope of danger, which may ultimately be found by a court to be apparent in manufactured goods as a matter of law. * * * Apace with advanced technology, a relaxation of the *Campo* stringency is advisable. A casting of increased responsibility upon the manufacturer, who stands in a superior position to recognize and cure defects, for improper conduct in the placement of finished products into the channels of commerce furthers the public interest. To this end, we hold that a manufacturer is obligated to exercise that degree of care in his plan or design so as to avoid any unreasonable risk of harm to anyone who is likely to be exposed to the danger when the product is used in the manner for which the product was intended, as well as an unintended yet reasonably foreseeable use.

What constitutes "reasonable care" will, of course, vary with the surrounding circumstances and will involve "a balancing of the likelihood of harm, and the gravity of harm if it happens, against the burden of the precaution which would be effective to avoid the harm."

*Micallef v. Miehle Co.,* 39 N.Y.2d 376, 385–86, 348 N.E.2d 571, 577–78, 384 N.Y.S.2d 115, 120–21 (1976) (citations omitted). Obviousness has not been eliminated as a factor in assessing liability, however. "Rather, the openness and obviousness of the danger should be available to the defendant on the issue of whether plaintiff exercised that degree of reasonable care as was required under the circumstances." *Id.* at 387, 348 N.E.2d at 578, 384 N.Y.S.2d at 122.

Some states have gone further in defining what goes into the balance and adopted Professor Wade's list of factors. *See, e.g., Dorsey v. Yoder Co.,* 331 F.Supp. 753, 760 (E.D. Pa. 1971), *aff'd,* 474 F.2d 1339 (3d Cir. 1973); *Auburn Machine Works Co. v. Jones,* 366 So.2d 1167, 1170 (Fla. 1979). The specific factors which enter into the final balance are:

(1) the usefulness and desirability of the product, (2) the availability of other and safer products to meet the same need, (3) the likelihood of injury and its probable seriousness, (4) the obviousness of the danger, (5) common knowledge and normal public expectation of the danger (particularly for established products), (6) the avoidability of injury by care in use of the product (including the effect of instructions or warnings), and (7) the ability to eliminate the danger without seriously impairing the usefulness of the product or making it unduly expensive.

Wade, *Strict Tort Liability of Manufacturers,* 19 Sw. L.J. 5, 17 (1965).[3]

---

**3.** It is interesting to note that this article was also cited in *Halvorson* in support of a balancing test very similar to that approved in *Dorsey, Micallef,* and *Auburn Machine Works.*

In this vein, one commentator has observed: "It has been argued that a rule of 'strict liability' which permits recovery for injuries arising out of defects in products only when those defects give rise to unreasonable dangers is borrowed from negligence theory [citing Wade, *Strict Tort Liability of Manufacturers,* 19 Sw.L.J. 5]. That is an apt observation, since both traditional negligence analysis and the 'unreasonable danger' analysis make liability depend upon whether the utility of the product or conduct in question outweighs, in light of all the circumstances, the risk of injury and the burden of taking precautions to prevent it." Comment, 1 Wm. Mitchell L.Rev. 207, 217.

*Halvorson v. American Hoist and Derrick Co.,* 307 Minn. 48, 56, 240 N.W.2d 303, 307 (1976). Although indicating approval of the test, the *Halvorson* court declined to apply it.

In approving the doctrine of strict products liability in *McCormack v. Hankscraft Co.,* 278 Minn. 322, 154 N.W.2d 488 (1967), this court recognized that not only is the manufacturer in a better position than a consumer to bear economic loss and to redistribute it via the cost of his product, but he is also better able to appreciate and minimize the risk of injury through the production of safer goods. *See also Lee v. Crookston Coca-Cola Bottling Co.,* 290 Minn. 321, 188 N.W.2d 426 (1971); Restatement (Second) of Torts § 402A comment c (1965).

The latent-patent rule of *Halvorson* protects manufacturers who sell products with dangerous, but obvious, design defects. It "encourages manufacturers to be outrageous in their design, to eliminate safety devices, and to make hazards obvious." *Auburn Machine Works Co. v. Jones,* 366 So.2d 1167, 1170 (Fla. 1979). Moreover, the rule shifts the entire economic loss to the injured party, notwithstanding the fact that the manufacturer was, to some degree, at fault.

This result is inconsistent with the underlying policy rationale supporting the strict products liability doctrine espoused in *McCormack v. Hankscraft Co.,* 278 Minn. 322, 154 N.W.2d 488 (1967), and in *Lee v. Crookston Coca-Cola Bottling Co.,* 290 Minn. 321, 188 N.W.2d 426 (1971). As the Washington Supreme Court correctly noted: "The manufacturer of the obviously defective product ought not to escape because the product was obviously a bad one. The law, we think, ought to discourage misdesign rather than encouraging it in its obvious form." *Palmer v. Massey-Ferguson, Inc.,* 3 Wash.App. 508, 519, 476 P.2d 713, 719 (1970). There is little evidence to support respondent's contention that the competition of the marketplace will motivate manufacturers to make their products better and safer.

Moreover, the *Halvorson* case is in conflict with current comparative fault law as amended by our legislature. In 1970, Minnesota adopted a comparative negligence statute. Minn. Stat. § 604.01 (1970). In *Springrose v. Willmore,* 292 Minn. 23, 192 N.W.2d 826 (1971), the scope of that statute was judicially expanded to include the assumption of the risk defense. The statute underwent a second redefinition in *Busch v. Busch Construction, Inc.,* 262 N.W.2d 377 (Minn.1977), when it was applied to strict liability claims as well. As a result, contributory negligence (other than the failure to inspect a product or to guard against defects), misuse, and assumption of the risk were specifically recognized as valid defenses. Finally, in 1978, the *comparative negligence* statute became a *comparative fault* statute. Minn. Stat. § 604.01, subds. 1–1a (1980). Contributory fault, including "unreasonable assumption of risk" and "unreasonable failure to avoid an injury," bars recovery only when it is greater than the fault of the party from whom recovery is being sought. *Id.*

The latent-patent defect rule makes obviousness a complete bar to recovery. It circumvents Minn. Stat. § 604.01 (1980) and swallows up the assumption of the risk defense. This result is contrary to the public policy of apportioning loss between blameworthy plaintiffs and defendants. *See* Comment, *Obviousness of Product Dangers as a Bar to Recovery: Minnesota Apparently Adopts the Latent-Patent Doctrine,* 3 Wm. Mitchell L.Rev. 241, 265 (1977).

Therefore, the latent-patent danger rule, as set out in *Halvorson,* is rejected and a "reasonable care" balancing test substituted therefor in the same manner that the courts of New York and Florida have done. Accordingly, this case is reversed and remanded for a trial consistent with this opinion.

SIMONETT, Justice (concurring in part and dissenting in part).

For the reasons persuasively set out in the court's opinion, I agree that the "latent-patent danger" rule of *Halvorson v. American Hoist and Derrick Co.,* 307 Minn. 48, 240 N.W.2d 303 (1976), should be overruled. The court, however, also holds that plaintiff may proceed to trial on both his negligence and strict liability counts. I would reverse

the summary judgment on plaintiff's first count for negligence but, since I do not see this as an appropriate strict liability claim, I would affirm as to the second count in strict liability.

There is a great deal of confusion in products liability law created by the overlapping theories of negligence, strict liability, and breach of warranty. While fine distinctions can be made, these are often of little help to the trial bench that has to instruct the jury and to the jury that has to bring in a verdict. For example, in *Randall v. Warnaco, Inc., Hirsch-Weis Division*, 677 F.2d 1226 (8th Cir. 1982), the trial court, applying North Dakota law, dismissed plaintiff's negligence count and submitted the case to the jury on strict liability. It did so on the grounds that to submit both theories would only be confusing to the jurors and that strict liability was a more favorable theory to protect plaintiff's rights. The jury found no strict liability. On appeal, the Court of Appeals, by a split decision, reversed, holding that negligence should have been submitted too. In *Magnuson v. Rupp Manufacturing, Inc.*, 285 Minn. 32, 171 N.W.2d 201 (1969), we held that it was not error for the trial court to have refused to instruct on strict liability since submission on negligence issues only did not prejudice the plaintiff. Trial courts, to play safe, will tend to submit products liability issues on all theories, but then there is a risk of a perverse jury verdict.[1] The best proof of this is *Halvorson*. There, on almost identical facts, the jury found negligence but no strict liability, and we held the verdict was "inconsistent and irreconcilable."

In this case the plaintiff was working on an aerial ladder in close proximity to an electric powerline. He knew the powerline was there and he knew the dangers involved. Nevertheless, in maneuvering the ladder, he "made a mistake," as his counsel put it, by "unconsciously exposing himself" to an obvious danger. As a consequence, plaintiff's arm (apparently not the ladder itself) came in contact with the powerline. Plaintiff's theory, really, is that the manufacturer could have protected him from his forgetfulness by doing more than affixing warning decals to the ladder, however adequate their message might be; the manufacturer should have equipped the ladder with insulation, sensors or other proximity warning devices which would have either warned plaintiff he was too close to the electric wires or prevented an electric current from passing through plaintiff to the ground.

Clearly, we have negligence issues here. The manufacturer, who has a duty to design and make a reasonably safe product, could reasonably have foreseen that its ladder would be used around electric powerlines and that people, being what they are, are at times preoccupied and forgetful. At the same time, plaintiff has a duty to use reasonable care for his own safety and the obviousness of the danger goes to his contributory negligence and assumption of risk. The same policy considerations that are served by strict liability are served by a negligence action. Manufacturers of unsafe products are to be held accountable. Unlike *Magnuson, supra*, where the risk of danger in operating a snowmobile was so obvious that strict liability was inapplicable, here, weighing the likelihood and severity of the harm (electrocution) against the burden of adding safety devices more effective than warning decals (insulation or sensors) makes a jury issue.

Why then do we have to superimpose still another theory on this case, a strict liability theory that is really a carbon copy of the

---

1. Since strict liability was first developed, contributory negligence has been allowed as a defense. And now our Comparative Fault Act requires a jury to lump negligence and strict liability together as "fault" and to compare the two.

   The comment of Dean Keeton is apt: "Our supreme courts should arrive at a theory of recovery to the exclusion of all others. Trial judges cannot under the present state of the law be criticized for being unable to submit a product liability case to a jury in a satisfactory manner." Keeton, *Product Liability and the Meaning of Defect*, 5 St. Mary's L.J. 30, 36 (1973).

negligence action? As a practical matter, where the strict liability claim is based on unsafe design or failure to warn, as is this case, there is essentially no difference between strict liability and negligence.[2]

It is said the distinctive feature of strict liability is that plaintiff does not have to establish negligence and that the focus is on the condition of the product, not the conduct of the manufacturer. This is not, however, quite true. To say the plaintiff does not have to prove negligence does not mean the manufacturer is not in some sense at fault, only that the plaintiff does not have to prove it. And it is not the product that is sued, but the person who makes or markets it. At the bottom of a strict liability theory is still the notion (certainly shared by jurors) that the manufacturer did something wrong and, therefore, should pay.

This notion of "wrongness" surfaces when the law attempts to define what it means by a defect. A defect is something which makes the product "unreasonably dangerous." And something is unreasonably dangerous "if the product is dangerous when used by an ordinary user who uses it with knowledge common to the community as to the product's characteristics and common usage." So we come full circle back to something with negligence overtones, and even more ironically, by adapting the consumer expectation test of what is "unreasonably dangerous" we have reincorporated the old tort rule of patent danger. The above-quoted definition of "unreasonably dangerous" is taken from *Halvorson,* which perhaps explains why that jury found no strict liability for an uninsulated crane without sensors being operated by an experienced operator in a situation of obvious danger.

Strict liability performs a great service in emphasizing the manufacturer's duty of care to put out a safe product. It continues to perform that service. Professor Wade's seven-point balancing test for a utility-risk standard (quoted in the court's opinion) is not, it seems to me, a definition of strict liability but only a guide to enable courts, as a matter of policy, to draw a line as to liability, whether that liability be characterized as negligence or strict liability or both.[3]

However, the only question before us is whether, on the facts presented, plaintiff may try his case in negligence or strict liability or both. I would hold this case is

---

**2.** See, e.g., *Knitz v. Minster Machine Co.,* 69 Ohio St.2d 460, 466 n. 5, 432 N.E.2d 814, 818 n. 5 (1982); *Brizendine v. Visador Co.,* 437 F.2d 822 (9th Cir. 1970) (applying Oregon law). As Professor Wade observes, "As in the design cases, there is [in the failure to warn case] little difference for the manufacturer (as distinguished from the supplier) in an action for negligence and one for strict liability." Wade, *On the Nature of Strict Tort Liability for Products,* 44 Miss.L.J. 825, 842 (1973).

If something goes wrong in the manufacturing process, if a product has a part missing or malformed or is made of improper materials, clearly we have a "defect" in the product in the common sense of the term. But to say a product *is* defective because *not accompanied with* operating instructions, or because it is without warning devices or because it lacks in the conception of its design, is to use the word "defect," as Professor Wade would say, "in a Pickwickian sense, with a special esoteric meaning of its own." *Id.* at 832. Words, of course, sometimes need to be used in a special sense, but when this is done, their impact on lay jurors *should be kept in mind.* Witness the trouble jurors have had with the term "proximate cause."

**3.** Professor Wade does not recommend that the jury be given his seven-point test. Some commentators urge one tort action. *See* Keeton, *supra;* and Wade, *supra,* at 849–50; *cf.* Twerski, *From Defect to Cause to Comparative Fault—Rethinking Some Products Liability Concepts,* 60 Marq.L.Rev. 297 (1977). Eventually, the various theories may coalesce into one tort, perhaps called "product fault liability," which will use the traditional concepts of negligence which have served so well and are understandable to jurors, while at the same time incorporating some of the notions of strict liability which stress the manufacturer's duty of care, the supplier's vicarious "breach of warranty" liability, and, in certain situations, a relaxation of the plaintiff's burden of proof as to the manufacturer's fault.

Thus, in this case, along with the standard negligence instructions, the court might add that the jury is to consider, on the manufacturer's duty of care among all the facts and circumstances, the likelihood that the operator may be exposed to dangers from the environment in which the product is used, the seriousness *of the dangers posed, and the mechanical* and economic feasibility of additional safety devices for the product.

to be tried in negligence only. I would hold, *on these facts,* where the danger in the use of the product by the plaintiff-user is fully obvious, and where the claims of "defect" are limited to assertions that the manufacturer should have added devices to its product to warn and protect the user against the obvious danger, that strict liability offers nothing but confusion to jurors and that only the negligence claim is to be submitted to the jury.

KELLEY, Justice (concurring in part and dissenting in part).

I join in Justice Simonett's concurring and dissenting opinion.

PETERSON, Justice (concurring in part and dissenting in part).

I join in the concurring and dissenting opinion of Justice Simonett.

AMDAHL, Chief Justice (concurring in part and dissenting in part).

I join in the concurring and dissenting opinion of Justice Simonett.