Dan **GERMANN**, Respondent,

v.

**F.L. SMITHE MACHINE COMPANY,**
**Defendant and Third Party**
**Plaintiff, Appellant,**

v.

**QUALITY PARK PRODUCTS, Third**
**Party Defendant, Respondent.**

No. C9–85–1442.

Court of Appeals of Minnesota.

Feb. 18, 1986.

Review Granted April 24, 1986.

Michael S. Ryan, Steven J. Kirsch, St. Paul, for Dan Germann, respondent.

Henry A. Cousineau, Jr., Minneapolis, for appellant.

Michael Forde, E.C. Forde, Minneapolis, for Quality Park Products, third party defendant, Respondent.

Heard, considered, and decided by POPOVICH, C.J., and WOZNIAK and SEDGWICK, JJ.

## OPINION

WOZNIAK, Judge.

F.L. Smithe Machine Company, the defendant in this products liability action, appeals from the judgment and from the trial court's order denying its motion for a new trial or judgment N.O.V. The jury found by special verdict that Smithe's hydraulic press was defective due to Smithe's failure to warn or instruct as to its safe use. We affirm.

## FACTS

On July 21, 1982, respondent Dan Germann injured his left leg when it was caught just below the knee in a hydraulic press manufactured by Smithe. At the time of the accident, Germann was operating the machine in the course of his employment at respondent Quality Park Products. Germann sued Smithe, and Smithe in turn brought a third-party action against Quality Park.

The Smithe hydraulic press (referred to as "machine 33") was used by Quality Park to cut paper stock into envelopes. The machine consisted in part of a stationary table and a moving table. During operation, the moving table would move toward and under the stationary table, creating a "pinch point."

Germann had operated machine 33 about 15 to 20 times before the accident. He had received a few minutes' training on this machine by a co-worker, but was trained more thoroughly on a different machine by his foreman. This machine was similar to machine 33 except, as Germann testified, machine 33 included some safety devices which the other machines did not have.

Machine 33 had three separate safety devices intended to prevent the type of accident which occurred here: an emergency stop or panic stop button; a "breaker bar" (also referred to in the record as a "crash bar" or "striker bar"); and a guard bar.

The panic stop was designed to stop all of the drives in the press, including the drive which pushed the two tables together. The breaker bar was attached to the stationary table of the press, extending along the side of the stationary table towards which the moving table would move. When pressure was exerted on the breaker bar, an electrical microswitch was activated which would stop all the drives in the press and cause the top of the stationary table to pop up, thereby creating a safe distance between the two tables.

The guard bar was bolted in two separate places on the stationary table. It was nothing more than a bar placed horizontally so as to physically prevent the operator from moving his leg into a position between the two tables. Plaintiff's expert testified that, because the machine was shipped from the manufacturer to the purchaser in two separate boxes, the guard bar had to be attached by the purchaser when the machine was installed. Plaintiff's expert also testified that the guard bar had to be removed to perform repairs and routine maintenance on the machine.

At the time of the accident, none of these safety devices was functioning. The wires connecting the panic stop and the breaker bar to the microswitch were disconnected and hanging loosely from the area where they would normally be attached. The guard bar was connected by only one bolt and was hanging loosely in a vertical position.

Machine 33 was shipped by Smithe and installed by Quality Park in December of 1975, over six and a half years before Germann's accident. Smithe was not involved

at all in the installation. Quality Park's maintenance foreman testified that he installed the machine and attached the guard bar without any difficulty, using two manuals which were provided with the machine. After installation, all three safety devices were tested and functioned properly. Over the following six and a half years, the machine was used continuously for at least two shifts a day. Quality Park's maintenance foreman testified that until the accident, he was unaware of any malfunction, accident or other problem with the machine's operation. He testified that he did remove the guard bar to perform repairs on the press at least one or two times during this period, but that unless he received complaints he did not inspect the machines on a regular basis.

Two Quality Park employees testified that the guard bar had been unattached for several months prior to the accident. One of these employees testified that the bar had loosened over time and finally swung down vertically, connected with only one bolt. There was conflicting testimony as to whether this situation was reported to the maintenance crew.

On the day of the accident, Germann had been operating machine 33 for about one and a half hours. He was operating a hydraulic foot pedal for the press when the two tables moved together, catching his left leg below the knee and crushing it. Although his leg hit the breaker bar, the tables continued to move together. He was unable to reach the panic stop button. Other employees pushed the button repeatedly, but the tables continued to squeeze Germann's trapped leg. The pressure on the leg was finally relieved by unplugging the entire machine. The day after the accident, the maintenance foreman reattached the guard bar and the disconnected wires, after which the machine operated perfectly.

Germann testified that he was unaware before the accident that machine 33 was supposed to have a guard bar which would have physically prevented him from moving his leg between the tables. There were no warnings or decals associated with the guard bar. The trial court stated in its memorandum that "[t]he uncontroverted evidence demonstrated that nowhere on the * * * machine, or in any of the literature accompanying the machine, was any reference made to the existence or function of the safety guard bar."

Two manuals provided with the machine, an operator's manual and a service manual, discussed the panic stop. The service manual explained the breaker bar only. Neither mentioned the existence of the guard bar, except in the parts list. Germann received no training from Quality Park as to the operation of the safety mechanisms.

The case was submitted to the jury on a strict liability theory only. By special verdict, the jury found that the machine was not defective by reason of its design. They found, however, that the machine was defective due to Smithe's failure to warn or instruct as to its safe use. The jury assigned 50% of the fault to Smithe and 50% to Quality Park, and awarded Germann $100,000 in damages. Smithe appeals from the judgment and from the trial court's order denying its motion for a new trial or judgment N.O.V.

### ISSUES

1. Does a manufacturer have a duty to warn of hazards resulting from a user's failure to normally maintain safety devices provided by the manufacturer?

2. Was the jury's finding that the user's failure to properly maintain the safety devices was foreseeable to the manufacturer manifestly and palpably contrary to the evidence?

3. Was the jury's finding that the manufacturer's failure to warn was a direct cause of the accident manifestly and palpably contrary to the evidence?

4. Is the defendant manufacturer entitled to a new trial on the issue of superseding cause?

### ANALYSIS

1. In their special verdict form, the jury found that the Smithe press was not defec-

tive because of its design. Implicit in this special verdict answer is a finding that the panic stop, the breaker bar, and the guard bar were not defectively designed. The jury found, however, that the Smithe press was in a defective condition and unreasonably dangerous due to Smithe's failure to provide adequate warnings or instructions for the safe use of its product.

■ Generally, an answer to a special verdict form may be set aside only where it is perverse and palpably contrary to the evidence, *Hauenstein v. Loctite Corp.*, 347 N.W.2d 272, 275 (Minn.1984), or where the evidence is so clear as to leave no room for a difference of opinion among reasonable persons, *Jacobs v. Rosemount Dodge-Winnebago South*, 310 N.W.2d 71 (Minn.1981).

■ The question whether a duty exists upon which liability may be predicated, however, is a question of law for the court. *Stratioti v. Bick*, 704 F.2d 1052, 1054 (8th Cir.1983) (diversity case applying Minnesota law); W.P. Keeton, D. Dobbs, R. Keeton & D. Owen, *Prosser & Keeton on the Law of Torts* § 37, at 236 (5th ed. 1984).

■ In *Westerberg v. School District No. 792*, 276 Minn. 1, 148 N.W.2d 312 (Minn.1967), the supreme court was faced with a factual situation similar to that presented in this case. *Westerberg* involved a high school freshman whose arm was torn off below the elbow when he reached into the school's commercial laundry extractor while it was still spinning. The extractor was sold and delivered to the high school six years prior to the accident and was equipped with a safety lid lock which prevented the operator from opening the lid until the basket stopped spinning. After the accident, it was discovered that the ball joint connecting the safety lever cable to the cover was broken, permitting the lid to be opened while the machine was running. The jury found that the manufacturer was not negligent in the design of the safety mechanism but was negligent in its instructions as to maintenance and in failing to have a warning on the extractor.

The defendant manufacturer appealed, and the supreme court reversed the verdict for the plaintiff and ordered the trial court to grant the manufacturer's motion for judgment N.O.V. The court stated:

[T]he jury has found that there was no negligence in the design of the safety features of the chattel. So we start with the premise that the machine as designed, constructed, and delivered was not a dangerous instrumentality and that the safety apparatus would eliminate any danger in use of the machine so long as the safety devices were functioning properly and maintained as they were designed. The question then becomes whether the manufacturer of a chattel free from danger if maintained in the condition in which it is sold must warn against a danger that may exist if the safety features provided are broken or not maintained by the user.

\* \* \* \* \* \*

There is a distinction between operational instructions and a warning of inherent danger in the use of a chattel. The manufacturer of a chattel can hardly be expected to warn of every conceivable danger that might arise from misuse of the chattel or failure to maintain it after it breaks down. Here the machine as delivered was safe if used properly. It was used without mishap for a period of six years. \* \* \* It would be carrying the duty of a manufacturer too far to require it to anticipate every injury that may occur when the machine is improperly used.

\* \* \* \* \* \*

*The duty to warn rests on foreseeability. \* \* \* If the chattel is safe when sold, a manufacturer is not required to anticipate or foresee that a user will alter its condition so as to make it dangerous, or that he will continue to use it after it becomes dangerous due to alteration in safety devices intended to protect the user from harm.*

276 Minn. at 6, 7, 10, 11, 148 N.W.2d at 315, 316, 317, 318 (emphasis added) (footnote omitted).

*Westerberg* thus stands for the proposition that the creation of a hazardous condition due to alteration of or failure to maintain safety devices is not foreseeable as a matter of law and therefore gives rise to no duty to warn or instruct. If applicable, *Westerberg* is clearly dispositive of this appeal.

Respondent argues that *Westerberg* is no longer good law in Minnesota for two reasons: first, because *Westerberg* involved a cause of action for negligence, not strict liability, and was decided prior to the Minnesota Supreme Court's adoption of section 402A of the Restatement (Second) of Torts;[1] and second, because the rule in *Westerberg* has been modified by subsequent caselaw.

With regard to respondent's first argument, in failure-to-warn cases, there is essentially no difference between negligence and strict liability. Under both theories, the duty to warn rests on the negligence concept of foreseeability. *Bilotta v. Kelley Co.*, 346 N.W.2d 616, 622 (Minn.1984) (citing *Westerberg*, 276 Minn. at 9–11, 148 N.W.2d at 316–18). The court in *Hauenstein* stated:

> Several jurisdictions have recognized that the standard for the duty to warn in strict liability cases is based on concepts of negligence. If the failure to warn is not negligent, the product is not "defective," and there is no strict liability. *See* Annot., 53 A.L.R.3d 239, 246 (1971). This parallel was noted in the dissenting opinion in *Holm v. Sponco Manufacturing, Inc.*, 324 N.W.2d 207 (Minn.1982): "As a practical matter, where the strict liability claim is based on * * * failure to warn * * * there is essentially no differ-

ence between strict liability and negligence." *Id.* at 215.

347 N.W.2d at 274.

Respondent's second argument, that the continuing validity of *Westerberg* is clouded by subsequent caselaw, has more merit. The court's holding in *Westerberg* was based in part on the rationale that "[w]here a chattel is safe for the use for which it is intended, ordinary care does not require the manufacturer to anticipate its improper use." *Westerberg*, 276 Minn. at 8, 148 N.W.2d at 316. We believe this is no longer the law. In *Frey v. Montgomery Ward & Co.*, 258 N.W.2d 782 (Minn.1977), the supreme court held that the duty to warn consists of two duties: "(1) The duty to give adequate instructions for safe use; and (2) *the duty to warn of dangers inherent in improper usage.*" *Id.* at 787 (emphasis added). The court in *Frey* cited *Westerberg* with approval for the proposition that "the manufacturer's duty to warn must rest on foreseeability, with no duty to warn of an improper use that could not have been foreseen." *Frey*, 258 N.W.2d at 788. The *Frey* court went on to state that *"whether the risk for which there was no warning was a reasonably foreseeable one was properly a jury question."* *Id.*

2. Because the rule of *Westerberg* has thus been limited by *Frey*, the issue of the foreseeability of the danger arising from failure to maintain the safety devices was properly a jury question. This court may set aside the jury's determination of this issue by special verdict only if that determination is perverse and palpably contrary to the evidence. *Hauenstein*, 347 N.W.2d at 275. This court need only find sufficient competent evidence reasonably tending to

---

1. Section 402A was adopted by the court in *McCormack v. Hankscraft*, 278 Minn. 322, 154 N.W.2d 488 (1967), and provides:

(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

(a) the seller is engaged in the business of selling such a product, and

(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

(2) The rule stated in Subsection (1) applies although

(a) the seller has exercised all possible care in the preparation and sale of his product, and

(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.

Restatement (Second) of Torts § 402A.

support and sustain the jury's finding. *Stuempges v. Parke, Davis & Co.*, 297 N.W.2d 252 (Minn.1980).

■ Applying these standards of review to this case, the jury's verdict must be sustained. The jury heard testimony by plaintiff's expert that, had the guard bar been in place at the time of the accident, the accident would not have occurred. It is not known how the guard bar came to be unattached at the time of the accident. However, there was sufficient testimony as to possible ways in which the bar might have become unattached, and from this testimony the jury could reasonably have inferred that Smithe should have foreseen that it would become unattached.

When shipped to the user by the manufacturer, the guard bar is not attached to the machine, but must be attached by the user. It is necessary to disconnect the guard bar from time to time to perform maintenance and repairs on the machine. Smithe was aware that it was necessary to rely on the user to attach the guard bar at the time of initial installation of the press, and to reattach it after repair and maintenance of the press. Furthermore, although plaintiff's expert did not testify on the question of vibration, three Quality Park employees testified at trial that the press vibrated while in operation. The jury could reasonably have inferred that the guard bar became unattached either because it was detached for maintenance purposes and not reattached, or because of vibration. The jury could also reasonably have concluded that this hazard was foreseeable to Smithe. While we may disagree with the findings of the jury, we cannot substitute our own judgment, and these findings are not perverse or palpably contrary to the evidence.

■ 3. The jury found that the defective condition of the press due to Smithe's failure to warn or instruct was a direct cause of the accident. This court may not set aside a jury determination of causation unless it is manifestly contrary to the weight of the evidence. *Flom v. Flom*, 291

N.W.2d 914, 917 (Minn.1980). In reviewing a special verdict:

[i]t is not our function to determine on what theory the jury arrived at its verdict. In reviewing the findings, we need only examine the record to decide whether the verdicts are consistent on any theory.

*Nihart v. Kruger*, 291 Minn. 273, 190 N.W.2d 776, 778 (Minn.1971).

■ Germann testified that he was not aware of the existence of the guard bar. The jury may reasonably have found that had Smithe affixed a decal or label to the machine, warning of the danger of operating the machine without the guard bar in place, Germann would have been alerted to the guard bar's existence and would not have operated the machine when he discovered that the bar was not properly attached. Likewise, the jury could have found that such a label or decal would have reminded the maintenance personnel to check the guard bar occasionally, and to reconnect it after performing any necessary repairs.

Furthermore, although some instructions as to the purpose and function of the panic stop and the breaker bar were provided in Smithe's service manual and operator's manual, the jury could reasonably have found that these instructions were inadequate.

■ 4. Smithe argues on appeal that Quality Park's negligence in this case supersedes any fault of Smithe's. The trial court did not give a superseding cause instruction to the jury, and there is no question regarding superseding cause in the special verdict form. Smithe did not request a jury instruction on superseding cause nor demand that it be submitted to the jury on the special verdict form. As a result, superseding cause is not the "law of the case" and cannot now be considered by this court. *See Lesmeister v. Dilly*, 330 N.W.2d 95, 100 (Minn.1983).

In addition, Rule 49.01, Minn.R.Civ.P., provides that:

The court may require a jury to return only a special verdict in the form of a special written finding upon each issue of fact. * * * If in so doing the court omits any issue of fact raised by the pleadings or by the evidence, each party waives his right to a trial by jury of the issue so omitted unless before the jury retires he demands its submission to the jury.

By failing to object to the special verdict form, Smithe has waived its right to a new trial on the issue of superseding cause.

## DECISION

The trial court is affirmed.